NATIONAL BANK OF COMMERCE OF KAN-
SAS CITY v. FLANAGAN MILLS AND ELE-
VATOR COMPANY and UNITED STATES FI-
DELITY & GUARANTY COMPANY; UNITED
STATES FIDELITY & GUARANTY COM-
PANY, Appellant.

**In Banc, July 18, 1916.**

1. **GUARANTY BOND: Receipts for Grain: Ambiguous Mean-
ing: Extrinsic Evidence.** If the language of a bond is am-
biguous and doubtful in its meaning, extraneous evidence may
be introduced and considered to determine its meaning. And
the language of a bond given to secure the faithful perform-
ance of "receipts and other instruments" issued by "the Flana-
gan Mills & Elevator Company, engaged in the management
and operation of elevators and warehouses for the storage
of grain" and proposing "to issue warehouse receipts and
other instruments evidencing that it is holding grain and
other commodities, deliverable upon the request or order of
another person or his assignee" and reciting that "it is con-
templated by the parties hereto that warehouse receipts, to be
issued by the Flanagan Mills & Elevator Company, may be
hypothecated with the National Bank of Commerce as collat-
eral security," when read in connection with a note given
by said company to said bank reciting that to secure its
payment "the following warehouse receipt" is hereto attached
"as collateral security," and in connection with another in-
strument captioned a "warehouse receipt" and reciting that
there has been received in said "warehouse and elevators" a
certain number of "bushels of grain and its product, subject
only to the order hereon of the National Bank of Commerce,"
is ambiguous and doubtful, and extrinsic evidence may be
considered for the purpose of determining whether the milling
company was a warehouseman, and whether the parties un-
derstood the written instruments denominated "warehouse re-
ceipts" to be in fact real and true warehouse receipts or
"other instruments" mentioned in the bond.

2. **WAREHOUSE RECEIPTS: Bailment.** If the "warehouse re-
ceipts and other instruments" mentioned in the bond as con-
taining the obligation to be performed by the maker, were
not in fact warehouse receipts, the relation of bailor and
bailee did not exist, and the bondsman is not relieved from
liability by a destruction, of the commodity mentioned in

the instruments, by fire which was not the result of its fault or neglect.

3. **WAREHOUSEMAN: Milling Company: Receipts.** A milling company which bought and stored in its own mills grain for its own use, buying large stocks at advantageous times with money borrowed from a bank for the purpose, and grinding and using it in its usual milling business, and issuing receipts against it as collateral security for the money borrowed, was not a warehouseman and such receipts were not warehouse receipts.

4. ————: **Obligation to Deliver Grain upon Demand: Pledge: Liability of Guarantor.** The milling company issued a "warehouse receipt" which recited that it had received "in Warehouse and Elevators A. B. at Rich Hill, Mo., five thousand bushels of grain and its product, subject only to the order hereon" of a certain named bank, and used the receipt as collateral security for money borrowed from the bank, and a guaranty company entered into ʳ bond obligating itself that the milling company would "faithfully redeem all such receipts and other instruments issued by it" and fully comply with every "obligation incident thereto or arising therefrom, and at all times deliver the grain demandable by any warehouse receipt or other instrument issued" by the milling company "in connection with the business of conducting said elevator." The milling company used the money so borrowed in buying grain, which it stored in its elevator and, in the usual way of conducting its milling business, ground into products which it stored in its warehouse, all of which were destroyed by accidental fire. The grain never was in possession of the bank. *Held*, that the transaction was not a sale, nor a mortgage; nor was it a pledge of the grain or its product, because there was no delivery either in fact or otherwise; but when the note, receipt and bond are read together, together with the extrinsic evidence showing that the milling company was engaged in the usual milling business, the primary purpose intended is seen to have been collateral security, and the agreement to have been an obligation to deliver the commodity mentioned in the "receipt" upon default in the payment of the note after legal demand, and the guaranty company is liable for the amount of the note.

5. ————: ————: **Presumption in Favor of Validity of Instruments.** The law presumes that parties solemnly entering into written obligations intend to make instruments that will legally effectuate their intentions; and an instrument which characterizes itself a "warehouse receipt" and reciting that its maker, a milling company, has ̠eceived in its elevators a certain number of bushels of grain and its product subject

to the order of a named bank and placed with said bank as collateral security for money borrowed, will not be held to be a warehouse receipt, or a pledge of the commodity, when such holding would make it invalid for any purpose, but will be held to be what the parties intended it should be, namely, an agreement to deliver the grain and its product to the bank upon default in the note and legal demand of payment.

6. ————: **Storing Own Commodity: Form of Receipt.** A milling company, which handles and stores grain to be used only in the ordinary course of its milling business, is not a warehouseman, either at common law or under the statute, because it is not engaged in the business of receiving and storing goods, wares and merchandise for others; and that being so, the mere form of a receipt concerning such grain issued by it is not sufficient to make it a warehouse receipt.

7. ————: **Receipt: Collateral Security.** A receipt purporting to be a warehouse receipt, issued by a debtor who is not a warehouseman, on property in his possession and owned by him, for the sole purpose of securing a creditor, is not in any sense a warehouse receipt.

8. ————: ————: ————: **"For Money Loaned:" Statute: Ejusdem Generis.** Sec. 11952, R. S. 1909, declaring that "no warehouseman, wharfinger, or other person, shall issue any receipt or other voucher upon any goods......grain, flour, or other produce......for any money loaned," etc., does not refer to a mere merchant or manufacturer, and if the proof fails to show that the person issuing the receipt was not a warehouseman, engaged in a warehousing business, it cannot be held to be a warehouse receipt, for the words "or other person" mean warehouseman, wharfinger or other person engaged in a similar business.

9. **GUARANTY COMPANY: Guaranty of Contracts: Charter Power.** The charter of a corporation investing it with power to guarantee the punctual performance and collection of contracts authorized the company to guarantee the agreement of a milling company to turn over the amount of grain and grain products, mentioned in a collateral instrument issued by it and placed with a bank as collateral security for money borrowed, upon demand, after default upon the note.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover*, Judge.

AFFIRMED.

*Yates & Mastin* and *Perry S. Rader* for appellant.

(1)    By the terms of the so-called warehouse receipts the grain mentioned therein was held by the Flanagan Company subject to the order of the National Bank of Commerce upon "surrender of this receipt and payment of the charges." There was therefore a pledge of the grain mentioned in each receipt to the bank and the receipts merely evidenced the symbolical delivery of the grain owned by the Flanagan Company to the bank. 31 Cyc. 806; 30 Ency. Law (2 Ed.), p. 69, sec. 4; Conrad v. Fisher, 37 Mo. App. 366; Bank v. Ross, 9 Mo. App. 411; Bank v. Cotton Compress Co., 11 Mo. App. 341. "A pledge is defined to be a bailment of personal property as security for some debt or engagement." Evans v. Darlington, 5 Blackf. (Ind.) 322; Story on Bailments, old sec. 197, new sec. 286; Stearns v. March, 4 Denio (N. Y.), 227; Brewster v. Harrity, 37 Cal. 25. A pledge is a bailment. 3 Ency. Law, p. 742, sec. 4. A collateral pledge is a bailment of personal property. Moffat v. Williams, 36 Pac. (Colo.) 915. To make it valid, delivery, of course must accompany a pledge, but this may be either actual or constructive. Jacksonville v. Flowers, 42 S. E. (Ga.) 475. In such a bailment (that is, a bailment of personal property by way of pledge), being for the benefit on both parties, a bailee is required to exercise only ordinary diligence in the care of the property. 3 Am. & Eng. Ency. Law, p. 746. The same rule applies to our situation. The obligation created by the contract, i. e., the warehouse receipts and the bonds in evidence, being for the delivery of the grain upon the order of the bank, its loss by fire is not within the terms of the contract because it is not so expressly stipulated. McEvars v. Steamboat Sangamon, 22 Mo. 190; Link v. Hathaway, 143 Mo. App. 514; 3 Am. & Eng. Ency. Law (2 Ed.), p. 751. (2)    If the grain in question was symbolically delivered by the elevator company to the

bank under these warehouse receipts the same became
a bailment for the mutual benefit of both parties to the
transaction, the grain secured to the bank the money
advanced by it to the elevator company which was a
benefit to the bank and the elevator company on the
other hand obtained the loan in evidence, which was to
its advantage. The petition is for damages for the
failure of the elevator company to deliver the grain
upon demand. The relation of the elevator company
to the grain is fixed by the terms of the warehouse re-
ceipts in evidence and under the authorities cited the
transaction is one of bailment only. The custodian of
the property the subject of the bailment is liable for
failure to deliver the same on demand only in case of
his negligence in caring for same. Gashweiler v.
Railroad, 83 Mo. 112; Holtzclaw v. Duff, 27 Mo. 392;
Story on Bailments (9 Ed.), sec. 444; Angell on Car-
riers, sec. 415; 31 Cyc. 827; Preston v. Prather, 137
U. S. 604; Milling Co. v. Transit Co., 122 Mo. 247; 30
Ency. Law, 48; 31 Cyc. 827. (3) The contract sued
on made by Flanagan Mills & Elevator Company as
principal, and appellant as surety, after reciting the,
fact that the elevator company proposes to issue ware-
house receipts "evidencing that it is holding grain"
deliverable upon the request or order of another per-
son refers to such receipts in the following significant
language which we think decisive of the relation sus-
tained by the elevator company to the grain involved
in this suit: "Which receipts and instruments are in-
tended to be delivered either in case of sale or pledge
or as evidence of a bailment." The property there-
fore could have been and was held only as a pledge and
as a bailment and the laws affecting such a situation
necessarily fixes the appellant's status. (4) The appel-
lant company was not sued in this action nor
could it have been because of the failure of the
elevator company to pay its indebtedness to the

bank, but to the contrary as stated in the petition because of the failure of the elevator company to deliver to the bank on demand the grain mentioned in the warehouse receipts since the warehouseman could not be held on the warehouse receipts for failure to deliver without showing that the warehouseman had been guilty of negligence in caring for the grain. The only duty imposed upon the elevator company by the warehouse receipts was the delivery of. the grain which failure to deliver was excused by the loss of the property by fire. Frost on Guaranty Insurance (2 Ed.), p. 42. To hold that the Guaranty Company assumed any greater responsibility than that for the fidelity of the warehouseman in caring for the grain and that its loss or destruction by fire was within the contemplation of the contract is to convert the contract into a policy of fire insurance and the making of such a contract as shown by the charter of the company in evidence is not within the powers of the company. Morgan v. Railroad, 40 S. W. (Tex.) 985.

*Robinson & Goodrich* for respondent.

(1) Properly construed, the written instruments executed and delivered by the mill company to the bank, as collateral to secure the payment of loans made by the bank to the mill company, were simply agreements on the part of the mill company to deliver to the bank, on demand, the quantities of grain therein specified. (a) The duty of the trial court was to ascertain what was the intention of the parties, and to give effect of such intention. That is the fundamental rule in the interpretation of all contracts. Koehring v. Muemminghoff, 61 Mo. 403; Ellis v. Harrison, 104 Mo. 270; Griffin v. McIntosh, 176 Mo. 392; Donovan v. Boeck, 217 Mo. 87; Buxton v. Kroeger, 219 Mo. 224; Arnett v. Williams, 226 Mo. 109; St. Louis v. Railway Co., 228 Mo. 712; Mathews v. Modern Woodmen, 236

Mo. 326; Moran Mfg. Co. v. Caldwell, 240 Mo. 258. (b).
In ascertaining the intention of the parties, the bond
sued on, the notes and the receipts should all be con-
strued together, they all relating to, and being parts of
the same transaction. Insurance Co. v. St. Mary's
Seminary, 52 Mo. 480; McGregor v. Con. Co., 188 Mo.
611; Nichols v. Kern, 32 Mo. App. 1; Reucking v.
McMahon, 81 Mo. App. 422; Ramlose v. Dollman, 100
Mo. App. 347. (c) And said instruments, the bond,
notes and receipts, must be read in the light of the
facts and circumstances surrounding the parties at the
time of the transaction. Gathwright v. Callaway, 10
Mo. 663; Price v. Evans, 26 Mo. 30; Crawford v. Elli-
ott, 78 Mo. 497; Nordyke v. Keahler, 155 Mo. 643; Dono-
van v. Broeck, 217 Mo. 70; Moran Mfg. Co. v.Caldwell,
240 Mo. 358; Thompson v. Lindsay, 242 Mo. 53; Dob-
bing v. Edmonds, 18 Mo. App. 307; Kellerman v.
Wrecking Co., 137 Mo. App. 392; St. Louis v. Railway
Co., 228 Mo. 712; Kreitz v. Eglehoff, 231 Mo. 694; Ken-
yon Co. v. Cutlery Co., 143 Mo. App. 518; Weeks Co. v.
Zinc Co., 153 Mo. App. 387; Bank v. Chick, 170 Mo.
App. 347. (d) If a contract admits of more than one
construction, one of which will render it inefficacious or
nullify it, that construction should be adopted which
will carry it into effect. Leiweke v. Jordan, 59 Mo.
App. 624; Buck v. Harris, 125 Mo. App. 368; Kelerher
v. Henderson, 203 Mo. 514; Peckham v. Haddock, 36
Ill. 38. (e) The law is well settled that where a contract
is fairly and reasonably open to two constructions, one
making it legal and the other illegal, the former must
be adopted. Ferry Co. v. Railroad, 128 Mo. 224; Wa-
ter Co. v. Lamar, 128 Mo. 245; Jones v. Williams, 139
Mo. 85; Boonville v. Stephens, 238 Mo. 354; Hobbs v.
McLean, 117 U. S. 567; Gurnsey v. Cook, 120 Mass. 501;
Lawson on Contracts, sec. 389. (f) All of the foregoing
rules of interpretation apply to a contract of guaranty,
as well as to any other written instrument. Kansas

City v. Yeomans, 213 Mo. 165; Bohne v. Murphy, 46 Mo. 59; Allen v. Bank, 4 Mo. App. 71; London Bank v. Parrott, 125 Cal. 481; Bank v. Gay, 57 Conn. 224; Iron Co. v. Water Wks. Co., 83 Iowa, 386; Cheever v. Schall, 87 Hun, 82; Morrow v. Brady, 12 R. I. 130; 20 Cyc. 1423. (g) Moreover, if a surety bond is fairly susceptible of two constructions, one favorable to the beneficiary and the other to the surety company, the former, if consistent with the purpose for which the bond was given, must be adopted. Hurley v. Fidelity & Deposit Co., 95 Mo. App. 93; Long v. Fidelity Co., 130 Mo. App. 428; Crayon Co. v. McNamara, 136 Mo. App. 463; Shine v. Bank, 70 Mo. 524; Surety Co. v. Pauley, 170 U. S. 133. Measured by these rules, the instruments executed by the mill company, and which are to be read into, and as a part of, the bond sued on in this case, must be construed as agreements on the part of the mill company to deliver to the bank the quantities of grain therein mentioned. (2) The receipts (instruments issued by the mill company and deposited with the bank as collateral security) were not warehouse receipts. (a) The mill company which issued these instruments was not engaged in the business of storing goods for others for compensation, and therefore not a warehouseman. Bank v. Frank, 12 Mo. App. 465; Conrad v. Fisher, 37 Mo. App. 368; Bank v. Trust Co., 135 Mo. App. 375; Sinsheimer v. Whitely, 111 Calif. 378; Hale v. Dock Co., 29 Wis. 488; Shepherdson v. Cary, 29 Wis. 42; Bucher v. Commonwealth, 103 Pa. St. 534; Bank v. Whitehead, 149 Ind. 560; Geifus v. Corrigan, 95 Wis. 561; Black's Law Dictionary (2 Ed.), p. 1218; Bouvier's Law Dictionary (New Ed.), p. 1211; Edwards on Bailments, sec. 332; 28 Am. & Eng. Ency. Law, 636; 40 Cyc. 460; 8 Words & Phrases, p. 7392. And the fact that the receipts were executed by warehouseman must affirmatively appear in the evidence. The fact that the mill company issued the re-

ceipts in question did not make it a warehouseman. Shepherdson v. Cary, 29 Wis. 34; Bank v. Whitehead, 149 Ind. 560. (b) A miller cannot issue a warehouse receipt for his own property. See authorities cited above. Bank v. Kent Mfg. Co., 186 Pa. St. 556; Trust Co. v. Dandridge, 37 S. W. 288; Trust Co. v. Trumbull, 137 Ill. 164; Thorne v. Bank, 37 Ohio St. 254; Steanbli v. Bank, 11 Wash. 426. (3) Said instruments issued by the mill company and deposited with the bank as collateral security, were not chattel mortgages because they did not convey the title to the grain therein specified. Jones on Chattel Mortgages (5 Ed.), secs. 1, 4 and 9; Parshall v. Eggert, 54 N. Y. 23; Robinson v. Campbell, 8 Mo. 365; Dean v. Davis, 12 Mo. 112; State ex rel. v. Adams, 76 Mo. 605. They were not chattel mortgages because they did not describe any particular grain. Williams v. Wylie, 69 Mo. App. 368; Holmes v. Com. Co., 81 Mo. App. 100. And because they contained no description of any debt to be secured. 1 Jones on Mortgages, sec. 70; Pettibone v. Griswold, 4 Conn. 158; New v. Sailors, 114 Ind. 407; Conrad v. Fisher, 37 Mo. App. 366. Nor did said instruments constitute pledges of the property therein mentioned, because there was no delivery of said property. Jones on Pledges (2 Ed.), secs. 1 and 23; 2 Kent's Com., 577; Corbett v. Underwood, 83 Ill. 324; Etchepare v. Agueirre, 91 Cal. 288; Casey v. Cavorac, 96 U. S. 467; Bank v. Frank, 12 Mo. App. 460. Nor did said instruments operate as a bailment of the property therein mentioned. To constitute a bailment, there must be delivery of property by one party to another. A miller cannot constitute himself the bailee of his own property. 1 Bouvier's Law Dictionary; Schouler's Bailments (2 Ed.), sec. 2; Jones on Bailments, secs. 1 and 117; 2 Kent Com., 558. (4) As said instruments issued by the mill company cannot be construed as mortgages, pledges or bailments, but can be

construed as simple agreements on the part of the mill company to deliver the grain therein specified to the bank, and as agreements of that kind may be hypothecated as collateral security, and as the bond sued on recites that they were to be hypothecated with the bank as collateral security, they must necessarily be construed to be mere agreements for the delivery by the mill company to the bank of the quantities of grain therein mentioned. Collateral security is property or contracts transferred to secure the performance of another obligation. 6 Am. & Eng. Ency. Law, p. 205. These instruments, executed by the mill company, could be hypothecated with the bank as collateral to secure the payment of the notes of the mill company to the bank. 7 Cyc. 278. (5) The receipts executed by the mill company, being simply agreements on the part of the mill company to deliver to the bank certain quantities of grain, and not providing against accidents by inevitable necessity, such as fire, the defendant was bound to make them good, notwithstanding all of the grain and grain products which the mill company had, were destroyed by fire. Davis v. Smith, 15 Mo. 469; Gibson v. Perry, 29 Mo. 246; Cochran v. Railroad, 131 Mo. 610; McQuiddy v. Brannock, 74 Mo. App. 542; Whittemore v. Sills, 76 Mo. App. 251; Shelby v. Railroad, 77 Mo. App. 207; Beatty v. Coal Co., 56 Mo. App. 230; Shouse v. Neiswanger, 18 Mo. App. 250; Fulkerson v. Eads, 19 Mo. App. 623.

Appellant's Brief in Reply:

(1) To reach the conclusion that the agreement was an "absolute and unconditional agreement to deliver to the bank the grain and its product called for by the receipts," many vital words in the bond must be disregarded, and those words plaintiff's counsel proceed to "put aside." They "put aside" the word "warehouse" at the beginning of the first preamble of

the bond, namely, "whereas, the Flanagan Mills & Elevator Company is engaged in the management and operation of elevators and warehouses and cribs attached thereto, for the storage of grain." They put aside the words "for the storage of grain" in said clause. They put aside the words "warehouse receipts" used in the next clause declaring that the Mill Company "proposes to issue warehouse receipts and other instruments evidencing that it is holding grain and other commodities, deliverable upon the request or order of another person or his assignee;" and say that the words "other instruments" are the important words, and the words in mind when the bond was made. They put aside the words "pledge" and "sale" and "or as evidence of a bailment" in the last clause of that whereas, declaring that said "receipts and instruments are intended to be delivered either in case of sale or pledge, or as evidence of a bailment." That clause clearly means that in case of a sale or a pledge of the grain, the Mill Company should be regarded as a bailee, and was to be bound only as a bailee is bound. The whole whereas contemplated that the grain should remain in the possession of the Mill Company, and in case of "sale" of the grain, or in case of a "pledge" of the grain, the receipts should be considered "as evidence of a bailment." But respondent says the parties did not mean that, they meant something else, there could have been no "pledge," and therefore the word "pledge" and the words "as in case of a bailment" must be "put aside as mere surplusage." They put aside the words "warehouse receipts" and the real meaning of the word "hypothecated" in the next "whereas," declaring that, "Whereas, It is contemplated by the parties hereto that warehouse receipts, to be issued by the Flanagan Mills & Elevator Company may be hypothecated with said National Bank of Commerce as collateral security;" and they say it was

not "warehouse receipts" that were hypothecated, but "other instruments" which were "absolute and unconditional agreements to deliver a certain number of bushels of grain." And they say that, in spite of the fact that the word "hypothecate" means "to pledge a thing without delivering possession of it to the pledgee;" and in-spite of the fact that the notes, for which these receipts were delivered by the Mills Company to the bank as "collateral security" said: "To secure the payment of this note . . . we have hereto attached, as collateral security, the following Warehouse Receipt, No. 3, hereto attached." They put aside the words "receipts" and "warehouse receipt" in the obligation of the bond. They say it was not "warehouse receipts" that the Guaranty Company agreed to redeem, but "other instruments," although the evidence absolutely fails to show that any other instruments were ever "issued" or delivered; and although their petition does not count upon "other instruments," but upon "warehouse receipts." They not only "put aside" these words in the bond, but they put aside these words in the receipt itself, namely, its bold caption, "Warehouse Receipt," and the words, "Received in Warehouse and Elevators A and B at Rich Hill, Mo.," and "the surrender of this receipt and payment of charges," and say that the caption, and the word "Received" and the words "Warehouse and Elevators" should be eliminated and that only the remaining words, namely, "five thousand bushels of grain and its product, subject only to the order hereon of the National Bank of Commerce" is of any importance, and that "it was immaterial whether the commodity was stored in the mill's elevator or warehouse at the time the agreements were made." In other words, they undertake to construct for the parties, and ask this court to construct for them, a contract which they did not construct for themselves, and they do that, and

ask the court to do it, by putting aside many of the vital words of the bond, the receipts and the notes. (2) Whether the receipts be considered warehouse receipts, or pledges or chattel mortgages or as constituting an equitable lien, they are either unenforceable for lack of definiteness, or if enforceable at all in no event could the judgment have exceeded $20,150. The judgment was not for the value of any grain but was arrived at by calculating principal and interest on each of the four notes mentioned, interest being calculated at 8 per cent. Can the Guaranty Company be compelled to answer for wheat, worth 75 cents, instead of corn, worth 40? There are cases holding such a contract to be void. "A warehouse receipt is invalid if it does not describe the property sufficiently to make its identification possible." 40 Cyc. 410; Ferguson v. Bank, 29 Am. Rep. 418, 14 Bush (Ky.), 555; Raffles v. Wichelhaus, 2 H. & C. 906, 33 L. J. Exch. 160; Gloeckner v. Kittlaus, 192 Mo. 478; Watson v. Gross, 112 Mo. App. 616; Price v. Atkinson, 117 Mo. App. 52; Bank v. Metcalf, 29 Mo. App. 394; Chandler v. West, 37 Mo. App. 635; Stonebaker v. Ford, 81 Mo. 537; Carroll & Co. v. Hamilton, 30 La. Ann. 522; Sanders v. Voorhees, 36 Kan. 141; Clark v. Voorhees, 36 Kan. 144; Meredith v. Kunze, 78 Iowa, 111. (3) If the receipts are void, the bond is void. Whatever they were, it was given to redeem them, and for nothing else. Daugherty v. Savage, 28 Conn. 146; Poor v. Merrill, 68 Iowa, 436; Jones v. Fisher, 116 Ill. 68. (4). The "warehouse receipts" for grain and its product were the only things received by plaintiff bank as collateral security for the payment of the notes. No "other instruments evidencing that it is holding grain" were delivered by the Mills Company to the bank. No other "instrument" is counted on in the petition. The petition sets out each "warehouse receipt" by its date and the amount of "grain and its product" called for in it, and

makes it the basis of the action, and does not claim or aver that any ''other instruments'' were ''executed and delivered to this plaintiff.'' It was the ''receipts,'' and not other ''instruments,'' that ''are intended to be delivered either in the case of sale or pledge or as evidence of a bailment.'' And, therefore, in this case, it was only the ''receipts'' that the Guaranty Company agreed that the Mill Company would ''at all times and in all cases faithfully redeem'' and not ''other instruments issued by it.'' (5) Whether the issuance and delivery of the receipts to plaintiff as ''collateral security'' constituted a sale or a chattel mortgage, or a pledge, or an equitable lien, the Mill Company was liable only as bailee. (a) The issuance and delivery of the receipts was a pledge of the grain and its product. The bond recites: ''And, Whereas, it is contemplated by the parties hereto that warehouse receipts, to be issued by the Flanagan Mills & Elevator Company, may be hypothecated with said National Bank of Commerce as collateral security. Taylor v. Hudgins, 42 Tex. 247; Watch Case Co. v. Dougherty, 62 Ohio St. 593; Spect v. Spect, 88 Cal. 441. In 21 Cyc. 1720, it is said that ''hypothecate'' means ''to pledge a thing without delivering possession of it to the pledgee.'' If that is a correct definition then the issuing and delivery of these ''warehouse receipts'' to the bank ''as collateral security'' for the payment of the notes was a pledge of the commodities described in them. Their ''hypothecation'' constituted a pledge. ''In those jurisdictions where a warehouseman may issue a valid warehouse receipt for his own goods a valid pledge may be effected by the delivery of such receipt.'' 40 Cyc. 426. (b) There is only one other theory upon which these receipts can be held to be legal instruments, and that is that they constituted neither a pledge, nor a sale, nor a chattel mortgage, nor a lien of any kind, but an unconditional agreement to deliver

to the bank a certain number of bushels of grain and its products upon the bank's demand. If their execution and delivery constituted such an agreement, then they constitute an agreement that is entirely outside the terms of the bond, and therefore the Guaranty Company is not liable. What it guaranteed that the Mill Company would redeem were "warehouse receipts to be issued by the Flanagan Mills and Elevator Company" when "hypothecated with said National Bank of Commerce as collateral security," "which receipts are intended to be delivered . . . as evidence of a bailment." Before this court can hold that these receipts constituted an unconditional agreement to deliver the grain, it must make a contract for the parties that they did not make for themselves; for no such agreement is found in the written instruments. (6) A warehouseman, having property of his own stored in his own warehouse, may, in the absence of prohibitory statutes, issue receipts thereon, and pledge the property as collateral security for money borrowed by him from the pledgee, by the delivery of such receipts. In Indiana, Wisconsin, Ohio, Pennsylvania and Massachusetts, and perhaps one or two other states, it has been held that the owner of grain or other commodity stored in his own warehouse cannot issue a warehouse receipt thereon that will be valid as to other creditors or innocent purchasers without notice. But we have been able to find no case that holds that such a receipt is invalid as between the parties. On the contrary, in the very recent case of Pattison v. Dale, 196 Fed. 5, receipts issued by a distiller for his own whiskey stored in his own warehouse in Ohio, were held, as between him and the holder with whom he had deposited them as collateral security for money loaned, to be valid, both as pledges and as warehouse receipts. Furthermore, in none of those states were there any statutes

268 Mo.—36

like our sections 11951, 11952, 11957 and 11959, R. S. 1909. In Kentucky, Michigan, Minnesota, Alabama, Georgia, Virginia, North Dakota, and other states, the owner of a warehouse or elevator may issue a valid warehouse receipt for his own goods stored therein, and pledge them as collateral security for money borrowed, and a delivery of the receipt is a symbolical delivery of the property pledged; and in every state having a statute like our section 11952, such receipts are not only held to be valid warehouse receipts as between the pledgor and pledgee, but as to third parties when they are indorsed in the manner prescribed by statute. Respondent's counsel say that "the Mills Company which issued these instruments was not engaged in the business of storing goods for others for compensation, and therefore not a warehouseman." That is not the test. In Love v. Storage Co., 143 Fed. 13, it is said: "An actual warehouse is not essential to the warehousing of goods. They may be warehoused upon a parcel of ground inclosed, or open, or partly so. And they may be warehoused upon what are the owner's premises at the time of the warehousing, and that, though they may be on those premises and without changing their location thereon. The only thing essential to the warehousing of goods is that their possession be changed from that of their owner to that of the warehouseman." That was said in a case where the owners of lumber had stacked it on four acres of fenced ground, and issued warehouse receipts upon it. Sec. 11952, R. S. 1909, is found in several other states, and in every one of them, where it has been construed by the courts, it has been held to authorize the owner of any kind of a warehouse to issue a valid warehouse receipt upon his own goods stored therein, and pledge them to the lender as collateral security for a loan of money to the debtor, Bank v. Barnes, 82 Ala. 607; Cochran & Fulton v. Ripey, 76 Ky. 495; Ferguson v.

Bank, 77 Ky. 555; 30 Am. & Eng. Ency. Law, p. 74; Broadwell v. Howard, 77 Ill. 305; Parshall v. Eggert, 54 N. Y. 21; State ex rel. v. Robb-Lawrence Co., 17 N. D. 257; Herrick v. Barnes, 78 Minn. 476; Bank v. Wilder, 34 Minn. 157; Bank v. Bank, 89 Minn. 119; Milliorn v. Clow, 42 Ore. 173; Millhiser Co. v. Mills Co., 101 Va. 579; Insurance Co. v. Kiger, 103 U. S. l. c. 356; Banking Co. v. Peacock, 103 Ga. 171; Note to State to use v. Robb-Lawrence Co., 16 L. R. A. (N. S.) 227; Herrick v. Barnes, 78 Minn. 475; Bank v. Hibbard, 48 Mich. 118; Hurley v. Santa Fe Ry., 213 U. S. 126, 134; Union Trust Co. v. Wilson, 198 U. S. 530; Bank v. Harkness, 42 W. Va. 156, 164; Pattison v. Dale, 196 Fed. 5; Gibson v. Stevens, 49 U. S. 398. (7) A bailee for hire is required to exercise only the ordinary diligence of a prudent man to keep the goods for the bailor, and is not responsible for their loss by fire, unless the fire is the result of his own fault or neglect. 40 Cyc. 431; Cox v. Railroad, 170 Mass. 129; McLane, Swift & Co. v. Elevator Co., 136 Mich. 664; Bank v. McCrea, 106 Ill. 292; Milling Co. v. Railroad, 127 Mo. App. 80, 92; Andrew McCollum v. Porter, 17 La. Ann. 89; Rice v. Nixon, 97 Ind. 97; Bottenberg v. Nixon, 97 Ind. 106; American Brewing Assn. v. Talbot, 141 Mo. 674; Security Storage Co. v. Denys, 119 Md. 330, 344; Gashweiler v. Wabash R. R., 83 Mo. 112. (8) The right of plaintiff to recover must be found in the written contract. Unless the bond and the receipts when read together entitled plaintiff to recover from the Guaranty Company, then the judgment cannot stand. The intention of the parties must govern, but it is their intention as ascertained from a fair interpretation of the written instruments that must govern. Morgan v. Porter, 103 Mo. 140; Tracy v. Iron Works, 104 Mo. 198; Construction Co. v. Tie Co., 185 Mo. 61; Walker v. Automobile Co., 124 Mo. App. 636; Eaton v. Coal Co., 125 Mo. App. 203; Buck v. Harris, 125 Mo. App. 368;

Marks v. Mill & Elevator Co., 43 Iowa, 146. (9) Unless the bond itself imposed upon the Guaranty Company an obligation that was greater and more comprehensive than was imposed on the Mills Company by the warehouse receipts, interpreted as warehouse receipts, then the liability of the Guaranty Company is that of a warehouseman and no more. Kilbridge v. Moss, 113 Cal. 435; Drummond v. Prestman, 12 Wheat. 520; Bank v. Strother, 22 S. C. 555; Walser v. Wear, 141 Mo. 464; Railroad v. Smith, 27 Mo. App. 377; Dupee v. Blake, 148 Ill. 453; Canton Institution for Savings v. Murphy, 156 Mass. 305. (10) This bond throughout speaks of the receipts as "warehouse receipts." In both whereas and in the last clause of the obligation it denominated them "warehouse receipts." The whole engagement shows that the parties were negotiating for the redemption of warehouse receipts, and that the obligors were to be bound only as a warehouseman is to be bound upon valid receipts issued by him, and that there might be no misunderstanding or doubt as to the extent of the obligation the bond says they are to be bound only as a pledgee is bound, or as a bailee is bound. It is immaterial whether the bonds were legal warehouse receipts, for the agreement only was to "deliver the grain demandable by any warehouse receipt issued by" the Mills Company, and the "receipts are intended to be delivered in case of a pledge, or as evidence of a bailment," and thereby the liability of the Guaranty Company was fixed as that of a bailee or pledgee which is the same as that of a warehouseman.

GRAVES, J.—This is an action upon the following bond:

"KNOW ALL MEN BY THESE PRESENTS,

"That we, the Flanagan Mills & Elevator Company, as principal, and the United States Fidelity and

Guaranty Company of Baltimore, Maryland, as surety, acknowledge ourselves to owe and stand indebted to the National Bank of Commerce of Kansas City, Missouri, its successors and assigns, in the sum of twenty-five thousand dollars for the payment of which we bind ourselves upon the following conditions:

"Whereas, the Flanagan Mills & Elevator Company is engaged in the management and operation of elevators and warehouse and cribs attached thereto, for the storage of grain, at Rich Hill, Missouri, which is known as the Flanagan Elevators, A and G, and proposes to issue warehouse receipts and other instruments evidencing that it is holding grain and other commodities, deliverable upon the request or order of another person or his assignee, or that it is under obligations concerning grain and other commodities in said elevator to such other person or his assignee, or by which it agrees to deliver grain and other commodities from said elevator to such other person or his assignee, or to hold it subject to the order of such other person or his assignee, which receipts and instruments are intended to be delivered either in the case of sale or pledge, or as evidence of a bailment; and,

"Whereas, it is contemplated by the parties hereto that warehouse receipts, to be issued by the Flanagan Mills & Elevator Company may be hypothecated with said National Bank of Commerce as collateral security.

"Now, Therefore, If the said Mills & Elevator Company shall at all times and in all cases fully and faithfully redeem all such receipts and other instruments issued by it, and fully and faithfully comply with each and every provision thereof, or obligation incident thereto, or arising therefrom, and at all times deliver the grain demandable by any warehouse receipt or other instrument issued by it, in connection with the business of conducting said elevator, then

this obligation to be void; otherwise to remain in full force and effect.

"Provided, However, that this bond is executed with the understanding and agreement and it is made a condition hereof, that said surety may cancel this obligation and its liabilities hereunder, by giving thirty days' notice, in writing, to said The National Bank of Commerce, or its successors, of its intention to do so, and remaining liable only for such breaches of this bond as may have been committed to date of such termination, which shall be thirty days after service of said written notice.

"In Testimony Whereof, the said Flanagan Mills & Elevator Company has caused this instrument to be executed by its president, and attested by its corporate seal, and the said United States Fidelity & Guaranty Company has caused this instrument to be signed by its attorney in fact, and its corporate seal affixed, by authority of its board of directors, this 18th day of October, 1905.

"(Seal) FLANAGAN MILLS AND ELEVATOR COMPANY,

By G. M. FLANAGAN, Pres.

"(Seal)    THE UNITED STATES FIDELITY and

GUARANTY COMPANY,

"By H. M. COUDREY,

"Attorney in Fact."

Acknowledged in due form.

The petition duly pleads the bond, and avers a breach thereof thus:

"That said Elevator Company did not, at all times and in all cases, fully and faithfully redeem warehouse receipts that had been issued by it and delivered to this plaintiff, and did not fully and faithfully comply with each and every provision of said warehouse receipts, and did not deliver, on demand, or at any time, grain demandable by warehouse receipts which it had issued and delivered to this plaintiff.

"That on the 31st day of October, 1905, said Elevator Company, for a valuable consideration, executed and delivered to this plaintiff its certain warehouse receipt, whereby it acknowledged to have received 25,000 bushels of grain and its product, and agreed to hold the same subject to the order of this plaintiff (which said grain and its product were represented to be, and were at all the dates herein mentioned, of the value of $20,000); that on the 17th day of November, 1905, said Elevator Company, for a valuable consideration, executed and delivered to this plaintiff its certain other warehouse receipt, whereby it acknowledged to have received 5000 bushels of grain and its product, and agreed to hold the same subject to the order of this plaintiff (which said grain and its product were represented to be, and were at all the dates herein mentioned, of the value of $4000); that on the 20th day of November, 1905, said Elevator Company, for a valuable consideration, executed and delivered to this plaintiff its certain other warehouse receipt, whereby it acknowledged to have received 2500 bushels of grain and its product, and agreed to hold the same subject to the order of this plaintiff (which said grain and its product were represented to be, and were at all the dates herein mentioned, of the value of $2000); that on the 2nd day of December, 1905, the said Elevator Company, for a valuable consideration, executed and delivered to this plaintiff its certain other warehouse receipt, whereby it acknowledged to have received 3750 bushels of grain and its product, and agreed to hold the same subject to the order of this plaintiff (which said grain and its product were represented to be, and were at all the dates herein mentioned, of the value of $2000).

"That by virtue of each and every one of said above mentioned warehouse receipts, this plaintiff became entitled to receive from said Elevator Company,

on demand, the grain and product thereof therein mentioned, and that on the —— day·of ——— 1906, this plaintiff demanded of said Elevator Company the grain called for in each and every one of said above mentioned warehouse receipts, but that said Elevator Company then failed and refused to deliver to this plaintiff any and all of said grain called for in each and every one of the above mentioned warehouse receipts, and that upon the failure and refusal of said Elevator Company to deliver said grain to this plaintiff, it demanded of said defendant, Guaranty Company, to make good its promise in said bond contained, and to pay to this plaintiff the damage by it sustained by reason of said refusal, but that said Guaranty Company has failed and refused to do so."

The record shows the execution and delivery to plaintiff of the several receipts described above, and shows the failure to pay the notes and the failure to deliver the grain mentioned in the receipts, as also the refusal of the surety company, the only appealing defendant, to make good its bond. All the notes and receipts are in the same form, and one of each is all that is necessary to show the contract between the parties. Below is one of each:

EXHIBIT NO. 2.

No. 189179

$2000.00                    Kansas City, Mo., Nov. 18th, 1905.

Due Demand.    On demand, after date, for value received, we promise to pay to the order of the National Bank of Commerce, of Kansas City, Mo., two thousand dollars, at the National Bank of Commerce, Kansas City, Mo., with interest from date until paid, at the rate of eight per cent per annum. To secure the payment of this note and of any and all other indebtedness which we now owe to said Bank, or may owe it at any time before the payment of this note, we have hereto attached, as collateral security, the following Warehouse Receipt, No. 3, hereto attached.

"All dividends and maturing coupons pending life of this loan shall be paid to holder of this note.

FLANAGAN MILLS & ELEVATOR CO.

CHARLES H. FLANAGAN, SEC'Y.

EXHIBIT NO. 3.
WAREHOUSE RECEIPT
l.o. 3 FLANAGAN MILLS AND ELEVATOR

Kansas City, Mo , Nov. 17th, 1905. ·

Received in Warehouse and Elevators A. B. at Rich Hill, Mo., five thousand bushels of grain and its product, subject only to the order hereon of National Bank of Commerce, Kansas City, Mo., and the surrender of this receipt and payment of charges.

It is hereby agreed by the holder of this receipt that the Grain and Product of Grain herein mentioned may be stored with other Grain and Product of same quality.

FLANAGAN MILLS & ELEVATOR CO.
CHARLES H. FLANAGAN, SEC'Y.

Counsel for the surety company thus outlines the answer in the case:

"In addition to a general denial the separate answer of the United States Fidelity & Guaranty Company admits that as surety only, and not otherwise, it executed the contract sued on and that its provisions were as charged. It is then alleged that the warehouse receipts mentioned in the petition are not in fact warehouse receipts under the laws of this State and that as such they are illegal and void, and that the same recites the fact to be that the Elevator Company had received from the plaintiff certain commodities whereas in fact no commodities of any kind whatsoever had been actually received into store or upon the premises the property of the plaintiff. The answer then alleges that by the terms of the contract sued on the defendant became liable thereunder 'only for the honesty and faithfulness of the said Flanagan Mills & Elevator Company in caring for, holding and keeping the said grain mentioned in said receipts in its said elevator or elevators as a warehouseman, and not otherwise, and that same should be forthcoming and deliverable upon such conditions and penalties as the laws of this State impose upon warehousemen only, and not otherwise.' That on the —— day of ———— 1906, and after the making of the contract or bond sued on the grain

mentioned in the receipts made the basis of this suit were wholly destroyed by fire without fault or neglect on the part of the Flanagan Mills & Elevator Company, by reason of which fact as alleged, no liability existed from defendant to plaintiff.

"It is further alleged that if the contract or bond sued on is susceptible of any other construction than that the same was and is a contract or bond for the faithful honest keeping and caring for and delivery of the grain in question by the Elevator Company as a warehouseman that said contract is ambiguous in that such construction would convert the said contract into a policy of fire insurance and not a contract for the faithful delivery of the grain, which kind of contract the defendant had no power or authority in law to issue and that such contract ought not to be so construed."

Reply placed in issue all new matters in the answer.

The elevator of the milling company was destroyed by fire January 29, 1906, and the evidence tends to show that the grain and its products mentioned in the receipts were in the elevator at the time.

Upon trial before the court plaintiff had judgment against both defendants in the sum of $21,578.40, and the surety company alone appealed. Other matters, if material, will be noted in the course of the opinion.

I. This case turns upon the construction to be given the several written instruments set out in the statement of facts. If the language of either is ambiguous or doubtful, extrinsic evidence may be considered to determine the meaning of the language used.

Bond:
Construction:
Extrinsic
Evidence.
This general rule of construction is too well established to require citations. In this case much depends upon the nature of the written instruments, sometimes

designated as warehouse receipts. Whether they are such is largely determinable by the facts, rather than the words. In none of the written instruments is it declared that the Flanagan Mills & Elevator Company was a warehouseman. The bond in suit mentions both notes and other instruments, including receipts. In other words, it states that the Flanagan Mills & Elevator Company was going to borrow money from the plaintiff's bank, and give as .collateral security receipts or other instruments issued by the said milling company. To determine the meaning of the written instruments called receipts, we think that in view of the uncertainty of the language used in the several instruments involved, we can go not only to the three instruments themselves, but to the extrinsic proof. We can go to all the written instruments, because they pertain to the same subject matter, and we can go to the extrinsic evidence, because the language used is ambiguous.

The question is, did the parties understand the written instruments put up as collateral security to be in fact real and true warehouse receipts, or the "other instruments" mentioned in the bond.

The contention of. the defendant is that the relation between plaintiff and the Milling Co.' was that of a bailor and bailee, and that the bailee is not responsible for the destruction of the property by fire, unless such fire was the result of negligence. The situation of the parties being considered, it cannot be said that this relationship existed, and hence a discussion of the liability or nonliability on the idea of such a relationship need not be made.

That the milling company was not doing a warehouse business is clearly indicated by the bond. There is no suggestion therein that it was so engaged. On the contrary, it is clearly indicated that the grain and grain products which were to be in its mill and elevator

were its own property and were to so continue. All through the record evidence it appears that this fore-east in the bond is borne out by the facts. In some three places in the record evidence it clearly appears that the grain bought and stored by the milling com-. pany was for its own use in mills at Rich Hill, Missouri. It was used in the ordinary course of a milling business, and of course would be changed from time to time by the purchase of new material, and the distribution of mill products. Neither the bond declares that the milling company was in the warehouse business, nor does the proof show it. On the contrary the proof shows that such company was in the usual milling business, buying large stocks of grain at advantageous times and intervals, and getting its money through the banks for the purpose of these purchases. If the milling company was not in fact a warehouseman, this goes far in assisting us in determining the construction to be given the written instruments involved in this record. All the evidence tends to show that it stored and kept no grain or grain products, except such grain as it purchased, and purchased at least partially with money borrowed from the plaintiff. When purchased the title of the grain was in the milling company, and when the grain was ground in the mill the products were likewise the property of the milling company. This title was never changed, unless by this written instrument. The possession, in fact, was never changed. The instrument itself does not undertake to segregate any particular property or designate any custodian except the milling company, so as to even make the written instrument a symbolical delivery of the property to the plaintiff. But we are going adrift from the thought with which we started in this paragraph, i. e., that the milling company was not in fact a warehouseman, and was never so understood to be by any of the parties interested.

Nothing in the written. instruments show the milling company to be a warehouseman, and the proof shows that such company was not a warehouseman. It is evident that the parties at the execution of the receipts, and at the previous giving of the bond in suit, fully understood that the milling company was not a warehouseman. With this conclusion, drawn from the surrounding facts, there remains the question of determining the character of these so called receipts.

II. When we consider the note, and the reference therein to the so called warehouse receipt, and the receipt itself, together, as we must do, it is clear that what the milling company really did, was, that it agreed to hold in its possession of its own grains and grain products the amount named in the receipt, which grain and grain product it agreed to deliver to plaintiff upon its demand in the event the milling company failed to pay the note on demand made by the bank.

Collateral
Security:
Intention.

The alleged warehouse receipt does not say from whom the grain and grain product was received by the milling company, but the extrinsic evidence shows that it did not receive it from the bank, but received it from itself. It held it not for the bank, but held it "subject only to the order hereon of National Bank of Commerce." It did not segregate and set aside such grain and grain products, so the same could be identified, but on the contrary provided that it should be stored with other like grain and grain products. So we reiterate, that when we take the peculiar wording of this instrument, and consider it alone with the note, and other evidence, we are forced to the conclusion that it is an agreement by the milling company to deliver from its store the amount of grain and grain product in the event the bank demanded its delivery, which demand it could not make until there was default

in the payment of the note after legal demand for its payment.

Some times the meaning of contracts can best be had by a process of elimination. First it is clear that the written instrument, whether it be an agreement to deliver grain upon demand, or a warehouse receipt, was clearly intended for collateral security. The bond was given to make this collateral security absolutely safe. It is presumed that the parties intended a contract that was valid and effective rather than one which was invalid and ineffective. With this in view let us begin the process of elimination. (a) There is no sale of the grain or grain products, and defendant does not so contend. (b) It is no mortgage, because it possesses none of the elements of a mortgage, and defendant does not content the said written instrument to be a mortgage. (c) Neither is it a pledge, because there was no delivery, either in fact or otherwise. One can't pledge his property to another by making delivery to himself, rather than to the pledgee. "To constitute a pledge, the pledgee must take possession; and to preserve it, he must retain possession." [Jones on Pledges, (2 Ed.), sec. 23.]

To like effect are: Bank v. Frank, 12 Mo. App. l. c. 465; Conrad v. Fisher, 37 Mo. App. l. c. 368; Bank v. Trust Co., 135 Mo. App. l. c. 375. Of course a pledge may be completed by a delivery to a third person for the pledgee, but such is not the case here. Not only was there no delivery, but there was not even a segregation of the grain and grain products for identification.

As said in the first instance, the parties intended collateral security. This is clear. The law presumes that they intended to make an instrument that would legally effectuate their intents. If so there is but one other construction, and that is that it is an agreement to deliver the grain and grain products to the bank

upon demand, provided the emergency for demand had arisen, and the bank was by such emergency empowered to make demand.

It is one of the well settled rules of construction that if a contract is fairly susceptible of two constructions, one making it legal and the other illegal, we should give it the construction which would make it effective and legal, rather than the other. [Lamar Water & E. L. Co. v. Lamar, 128 Mo. 188.]

III. We need not go further than the receipt itself to find ambiguity of expression, such as to allow us to go to extrinsic proof to get a right construction. The receipt fails to state from whom the grain and grain products were received. It likewise fails to make clear the nature of the order which might be made by the bank.

*Warehouseman and Warehouse Receipt.*

Much is left vague, and remains vague, until the whole transaction is placed in evidence. When the whole transaction is placed in evidence, it appears that Flanagan Mills & Elevator Company was a milling concern, and only handling and storing grain and mill products to be used in the ordinary course of its business. It was not a warehouseman either at common law or under the statute, because not engaged in the business of receiving and storing goods, wares, and merchandise, for others.

In such case the mere form of the receipt is not sufficient to make it a warehouse receipt. Proof must be made that the party issuing the receipt was in fact a warehouseman. No such proof appears in this case, but in fact the proof is to the contrary. Dixon, C. J., in Shepardson v. Cary, Executor, 29 Wis. l. c. 42, says:

"The court could not take judicial notice that they were warehousemen, nor presume it as a fact from the mere issuing of the receipt. Actual proof was necessary in order to make an effectual transfer

of the property in that way; for otherwise it would be competent for every person, whether warehouseman or not, thus to dispose of personal property in his possession, to the great embarrassment and deception of subsequent purchasers, creditors and others.

"To uphold the receipt as a proper warehouse document, transferring the title to the property and operating as a good constructive delivery of it to the vendee, it must in all cases distinctly appear that it was executed by a warehouseman—one openly engaged in that business—and in the usual course of trade, without fraud or intention of fraud or bad faith on the part of the person receiving and seeking to enforce title under it. In the former case, therefore, if for no other reason, the plaintiff could not have maintained title against the defendant upon the instrument as a warehouse receipt, because there was no proof of the business character of the makers, or evidence that they were warehousemen."

To like effect in Bank v. Whitehead, 149 Ind. 1. c. 575:

"It follows that a public warehouseman would have no more power to issue a warehouse receipt upon his own property in his warehouse, as security for a debt unless there was a statute expressly authorizing it, than would a debtor who is not a warehouseman. Where a debtor who is not a warehouseman issues a receipt purporting to be a warehouse receipt, on property in his possession and owned by him, for the sole purpose of securing a creditor, the same is not in any sense a warehouse receipt. [Conrad v. Fisher, 37 Mo. App. 352, 8 L. R. A. 152, 153; Mechanics' Trust Co. v. Dandridge, 37 S. W. (Ky.) 288; Sinsheimer v. Whitely, 111 Cal. 378; Geilfuss v. Corrigan, 95 Wis. 651; National Exchange Bank of Hartford v. Wilder, 34 Minn. 149; Steaubli v. Blaine Natl. Bank, 11 Wash. 426; Thorne v. First Natl. Bank, 37 Ohio St,

254; Union Trust Co. v. Trumbull, 137 Ill. 146, 164; Jones on Pledges, secs. 325, 326.]''

It will be observed that the Indiana court cites with approval some of the opinions from our Courts of Appeals we have cited, supra. The Pennsylvania court in Bank v. Jagode, 186 Pa. St. 1. c. 563, says:

"The Act of September 24, 1866, P. L. (1867) 1363, makes a warehouse receipt negotiable to the extent that the person taking a transfer of it by indorsement and delivery is to be deemed the owner of the goods therein specified. By the general law governing such instruments this means that the transfer of the receipt is a constructive delivery of the goods. If therefore the receipt under which the plaintiff claims was a valid warehouse receipt within the statute the plaintiff's title must prevail, notwithstanding the good faith and priority of the appellants' actual possession.

"But in order to have this effect, the requisites of the statute must be complied with, and plainly the first of these is that there must be a receipt issued from a bona-fide warehouse. The act does not prescribe any form of receipt, and it is conceded that the one in controversy is sufficient in that respect. It purports to be issued by a warehouseman, and to be for goods held on storage and deliverable on the order of the depositor and the return of the receipt.

"Nor does the act define a warehouse or a warehouseman, but uses the latter word in connection with 'wharfinger or other person' (ejusdem generis, Bucher v. Comm., 103 Pa. St. 528) in its ordinary signification of one who carries on the business of receiving and keeping goods on storage for the owners, for compensation. The act prohibits the issue of a receipt unless the goods shall have been actually received into store or upon the premises of the warehouseman; the issue of any second or duplicate receipt while the first is outstanding, without writing

268 Mo.—37

the word duplicate across the face of the second; the delivery of any goods receipted for except on surrender of the receipt; and the sale, incumbrance, etc., by the warehouseman of goods receipted for. *These provisions plainly contemplate that the warehouseman shall be one engaged in the business, and also that he, shall be another than the owner of the -goods.* A large part of the security of the holder of the receipt for the actual production of the goods when called for is the business interest and good faith of the warehouseman, and the penal consequences of any breach of duty by him. *This security would be greatly diminished, if not rendered worthless, if any owner could' choose to say his goods were on storage with himself and issue receipts which should pass from hand to hand for value,* while the goods remained under his own control, or subject to levy by his creditors." [See also: Union Trust Co. v. Trumbull, 137 Ill. l. c. 164; Thorne v. Bank, 37 Ohio St. l. c. 258; Steaubli v. Bank, 11 Wash. 426.]

Nor do sections 11951 and 11952 of our statutes change the situation. These statutes refer to warehousemen, and have no application whatever to persons not engaged in that business. The word "other person" used in the latter section, must under the rule *ejusdem generis,* be held to mean warehouseman or wharfinger or a person engaged in a similar business. [Bank v. Jagode, supra: Bucher v. Comm., 103 Pa. St. 528.] It does not refer to a mere merchant, or manufacturer. The proof in this case fails to show a warehouseman and therefore the written receipt can not be held to be a warehouse receipt.

IV.   Nor will it do to say that the bond executed by this defendant appealing here was not one fully within the charter powers of said corporation. Section 8 of its charter reads:

"Sec. 8. And be it further enacted, That said Company shall have power to guarantee, endorse and secure payment and punctual performance and collection of notes, debts, bill of exchange, contracts, bonds, accounts, claims, rents, annuities, mortgages, choses in action, evidence of debt, certificates of property of value, checks and title to property, indebtedness of individuals, of companies, partnerships, contracts, loans of states, cities, counties and municipalities, on such terms or commissions as may be agreed upon or established by said Company and the parties dealing therewith."

*Bond Authorized by Company's Charter.*

This is as broad as language can make it. They were empowered to guarantee the faithful performance of contracts, among divers other things. If the contract is as we construe it, i. e., that the milling company agreed to turn over the amount of grain and grain products mentioned in the collateral instrument upon demand, after default in the note, then a failure to turn it over breached the bond. This was the theory of the trial court. The amount of the verdict is well within the evidence, and the judgment should be affirmed. It is so ordered. All concur except *Woodson, C. J.,* absent, and *Bond* and *Revelle, JJ.,* not sitting.