**Paul V. BERRY and Norma F. Berry,**
**Appellants,**

**v.**

**Reginald CROUSE and Dorothy B. Crouse,**
**Respondents.**

**No. 50418.**

Supreme Court of Missouri,

Division No. 1.

March 9, 1964.

---

Tenney, Dahman & Smith, Edward H. Tenney, Jr., Robert L. Smith, St. Louis, for appellants.

Gray & Jeans, Charles E. Gray, St. Louis, for respondents.

WELBORN, Commissioner.

This is an action by appellants, husband and wife, to recover payments totaling $14,350 which they claim to have made on a contract to purchase a farm from respondents. The trial court, sitting without a jury, found that the payments were made as rental under a lease with option to purchase and that, by the terms of the lease, the appellants were not entitled to the return of the payments which they made. The appellants appealed from the judgment of the trial court to the St. Louis Court of Appeals. Because the petition sought the return to appellants of $14,350, together with interest thereon from January 1, 1958, the Court of Appeals concluded that the amount in controversy exceeded $15,000 and transferred the appeal to this court. Berry v. Crouse, Mo.App., 370 S.W.2d 724.

In February, 1956, the appellants sold a 40-acre farm owned by them in St. Louis County, Missouri. Interested in acquiring another farm, they obtained a listing of farms which respondent Dorothy Crouse, a real estate broker at Troy, Missouri, offered for sale. In February, 1956, the appellants went to Mrs. Crouse's office in Troy and inquired whether or not she had any farms listed which could be purchased with a $3,000 down payment. Mrs. Crouse asked one of her salesmen, Mr. Kramer, to show the Berrys some farms. He showed them two in which they were not interested. Returning to Troy with Kramer, they passed another farm which Kramer told them Mrs. Crouse owned. Kramer suggested that they ought to buy it. The Crouses had acquired the farm in 1955 and had advertised it for sale. The Berrys and Kramer returned to Mrs. Crouse's office. The Berrys told Mrs. Crouse they were not interested in the farms which they had been shown. However, they talked about the Crouse farm and Mrs. Crouse told them that she wanted $200 an acre for the 200-acre farm and suggested that they go look at the place. The Berrys did so and again discussed the price with Mrs. Crouse who reduced her price to $37,500. Berry told her that the price was too high. A week or so later, Kramer and Mr. Crouse came to the Berry residence in St. Louis County and suggested that the Berrys come to Troy on a Thursday night and discuss the farm. The Berrys did so. At that time Mrs. Crouse told them that she could sell 13 acres of the farm for $3,000 and that she could sell the remainder to the Berrys for $34,500. Mrs. Crouse, knowing that the Berrys had $3,000 to pay down, told them that, if they could raise an additional $1,500, they "might be able to do business."

A week or so later, Mrs. Berry called Mrs. Crouse and told her that, within a month, the Berrys could obtain an additional $1,500. According to Mrs. Berry, on the Thursday night prior to March 10, 1956, Mrs. Crouse called her and told Mrs. Berry that they would handle the transaction for $4,500 down; that the Berrys should come to her office on Saturday, bringing the $3,000, and that it would be agreeable to pay the remaining $1,500 by May 5. According to Mrs. Berry, Mrs. Crouse told her that she would have papers for the transaction prepared.

The Berrys went to Mrs. Crouse's office in Troy on the morning of Saturday, March 10, 1956. They had their check for $3,000 payable to Dorothy Crouse, which they gave to her. Two copies each of two separate documents, the first entitled, "Real Estate

Sales Agreement," and the second "Farm Lease," were executed by the parties on that date.

The sales agreement, which was prepared by Mrs. Crouse, was a single page document on a printed form on which blanks had been filled on the typewriter. The agreement acknowledged the receipt of $3,-000 as earnest money and as part of the consideration for a farm containing 190 acres of land, more or less, known as the Crouse Farm. The description of the farm was typed in the agreement. A certain portion was excluded, the language used being "this piece of ground not included in sale of farm." The agreement contained the usual language, "which farm is this day sold to said Paul W. Berry and Norma F. Berry, his wife, and purchased by both subject to the owner's approval and not otherwise, for the gross sum of $34,500.00." Following the statement of purchase price was the following typewritten:

"(With Contract of Deed)

"$3,000.00–Cash
  1,500.00–To be paid on or before May 5, 1956.
  4,500.00
$30,000.00–Due, with 6% int.
  5,000.00–plus int. due Oct. 29, 1956
  5,000.00–plus int. due Oct. 29, 1957"

(At either payment date, if loan for bal. can be obtained, Warranty Deed will be recorded).

There was typed on the form a requirement that $10,000 insurance was to be carried on the buildings, and this statement: "Privilege is given buyer to start farming for crops immediately." The agreement provided for closing of the sale under the contract on May 5, 1956. It bears the signatures of appellants and respondents. According to the evidence, the signature of the respondent Reginald Crouse was placed on the agreement by his wife. The agreement bears the date of March 10, 1956.

The "Farm Lease," a 5-page wholly typewritten document, recited that it was entered into between Reginald and Dorothy Crouse, as lessors, and the Berrys, as lessees. The land leased was the same as that covered by the sales agreement. The term of the lease was to March 1, 1958. The rental fixed was $3,000 upon execution of the lease; $1,500 on May 5, 1956; $5,900 on October 29, 1956; $750 on April 29, 1957, and $5,750 on October 29, 1957. The lessees were required to insure the improvements for $10,000. The document provided that the lessees should use the property as a farm but for no other purpose without the written consent of the lessors. The lessees covenanted to keep the improvements in good repair and to cultivate the premises in a "thorough, careful and husbandlike manner (according to the most approved methods of farming followed in Lincoln County) * * *." The lessees agreed to pay all taxes during 1956 and thereafter during the term of the lease.

The instrument gave the lessees an option to purchase the premises on the following terms: "If this option is exercised on October 29, 1956 after the rental payment of $5,900.00 is made or on April 29, 1957 after the rental payment of $750.00 is made the purchase price shall be $25,000.00. If this option is exercised on October 29, 1957 after the rental payment of $5,750.00 is made the purchase price shall be $20,000.00. If this option is exercised on March 1, 1958, the purchase price shall be $20,600.00."

The lease gave the lessors the right to terminate the lease on default by lessees of any of its conditions and the right to re-enter the premises upon such default. It gave the lessors free access to the premises for the purpose of examining them.

The lessees agreed to pay all utility bills charged against the premises for the term of the lease. Subleasing without the consent of the lessors was prohibited by the lease.

The lease bore the signatures of Reginald and Dorothy Crouse as lessors and the Berrys as lessees. It was sworn to and subscribed to before P. G. Grewach, a notary public, on March 10, 1956.

According to the Berrys, both of these documents had been prepared prior to their reaching Mrs. Crouse's office on March 10 and they signed two copies of each practically simultaneously. According to Mrs. Crouse, the sales agreement was first signed on the morning of March 10. She then took the document to her attorney and asked him to prepare the lease from it. Her attorney, Peter Grewach, testified that Mrs. Crouse brought him a document similar to the sales agreement that was introduced in evidence and asked him to draw up a lease with an option to buy, embodying the terms of the agreement. Grewach testified that he prepared the farm lease pursuant to such instructions and that it was signed by all four parties in his presence in Mrs. Crouse's office. According to Mrs. Crouse, it was signed in the afternoon of March 10 several hours after the signing of the sales agreement.

The Berrys testified that they did not receive copies of the documents which they signed on March 10 until some thirty to sixty days thereafter. According to them, Mrs. Crouse told them that they would have to be signed by Mr. Crouse. Subsequently, one or both of the Crouses, according to the Berrys, brought executed copies of the agreements to the Berrys. According to the Crouses, the Berrys were given copies of the documents at the time they were signed.

Berry took possession of the farm and began farming it shortly after March 10, 1956. In October, 1956, he moved his family to the farm. On April 28, 1956, Berry gave Mrs. Crouse a check for $1,500, as previously agreed. On October 27, 1956, Berry paid Mrs. Crouse $3,500.16 and on November 10, 1956, $2,399.84. Upon making the latter payment, Berry received a receipt showing a balance due of $25,000. On December 8, 1956, Berry paid Mrs. Crouse $347.05, being payment for taxes of $308.55 and insurance of $38.50.

On April 12, 1957, Berry paid Mrs. Crouse $750 and received from her a receipt on which she wrote "Int. for six months—$25,000." On October 30, 1957, Berry again paid $750 and obtained a receipt from Dorothy Crouse "received of Paul and Norma Berry, $750 Int."

The Berrys were unable to pay the remaining amount due on the October 29, 1957 payment. Berry attempted to arrange to pay one half of the amount remaining due on the payment. A check of a third person, in the amount of $1,200, which he gave the Crouses, was not paid when presented by them. In January, 1958, according to Berry, Mr. Crouse came to the residence on the farm and told Berry he was just a renter and could not remain on the place and that "he was throwing me out." According to Berry, he said: "I would have to set your furniture out on the highway if you don't get out." Berry testified that, in February, 1958, he moved from the farm.

According to Berry, his net income from his operation of the farm was approximately $4,000. He testified that, when he left in February, he left growing crops of wheat and corn which he had planted and which had a value of from $1,150 to $1,250.

On December 4, 1959, the Berrys filed this action in the Lincoln County Circuit Court. In their petition they alleged they had entered into the real estate sales agreement and had made payments under it in cash and crops in the total sum of $14,350. The petition alleged that, in December, 1957, the defendants notified the plaintiffs that "plaintiffs were in default under said contract, and that said contract was no longer in effect; that, pursuant to

defendants' demands and threats of eviction proceedings, plaintiffs vacated said property;" and that defendants refused plaintiffs' demands for a return of the payments made by plaintiffs. The petition prayed judgment for $14,350 together with interest from January 1, 1958.

The defendants' answer admitted the execution of the sales agreement; that, in December, 1957, the defendants notified the plaintiffs to vacate the premises and that they were in default. The answer further alleged the execution of the farm lease on March 10, 1956, and the plaintiffs' default thereunder and failure to exercise their option to purchase as provided in the lease. By an alternative counterclaim, the defendants asked that, should plaintiffs' claim be upheld, the defendants be given judgment for the reasonable rental value of the premises together with interest during the time of plaintiffs' occupancy.

By their reply, the plaintiffs admitted the execution of the farm lease and alleged that no consideration was received by them for the signing of that instrument. They also alleged that the lease was signed at the same time as the purchase contract and as part of the same transaction and that the instrument was prepared by the defendants and signed by the plaintiffs upon the assurance of Dorothy Crouse that it was merely part of the contract of purchase. They also alleged that their signing the instrument was induced by false representations of Dorothy Crouse "that the instrument was not important and just provided for the same things as were in the sales contract, except that it also provided that they should keep the farm in good shape and well cared for and that in Lincoln County, it was customary to sign such papers along with a sales contract."

The trial judge found that, "on March 10, 1956, the parties intended that the Sales Agreement was not to be their formal contract, but was to be supplanted by a more detailed written agreement, the Lease-Option, which was in fact executed by the

parties later the same morning; that such intent is supplied by the execution of the Lease-Option, and further by the parties' dealings in accordance with the terms thereof, and the plaintiffs' surrender of the premises and abandonment of the farm, all in accordance with the Lease-Option and contrary to the provisions of the Sales Agreement. The rights of the plaintiffs therefore are fixed by the Lease-Option, and any rights they had under the Sales Agreement have merged into the Lease-Option. All money paid by plaintiffs to the defendants has therefore become that of the defendants under the terms of the Lease-Option, and plaintiffs are not entitled to recover same."

Essentially, the appellants' position, both in the trial court and on this appeal, is that both the sales agreement and the farm lease relate to the same transaction and that, considered together, they present a patent ambiguity which should be resolved by a construction of the instruments against the respondents, who were responsible for their preparation, and in a manner that will be fair and equitable, i. e., favorable to the appellants. In their brief here, the appellants state: "We start out with the basic rule, followed in Missouri, that when two inconsistent contracts are executed as part of the same transaction, they should be read and construed together."

■  The addition of the prefix "in" before the word "consistent" places the appellants' proposition on an erroneous foundation. Correctly stated, the rule is that where two *consistent* contracts are executed as part of the same transaction, they should be read and considered together in order to ascertain the intention of the parties. Such was the rule applied in National Bank of Commerce of Kansas City v. Flanagan Mills and Elevator Co., 268 Mo. 547, 188 S.W. 117; Prater v. Rush, 228 Mo.App. 922, 74 S.W.2d 875, and Empire Gas & Fuel Co. v. Stern, 8th Cir., 15 F.2d 323, all cited by appellants in support of the proposition which they urge. However, these cases do

not support the proposition stated by appellants for they did not deal with inconsistent instruments. In the National Bank of Commerce case, the court found the language of a bond ambiguous and examined contemporaneous documents of the same transaction in order to ascertain the meaning of the ambiguous language. However, the ambiguity involved did not arise out of an inconsistency among the documents, but from a lack of clarity in the language used in one. In Prater, the court examined a subsequent agreement to ascertain the meaning which employers had given to a contract of employment. Again, however, the instruments involved were consistent, not inconsistent, writings. The same was true of the contract, draft and lease examined in the Empire Gas case.

The rule applicable in the case of inconsistent documents, such as appellants admit are here involved, is that, when two writings are inconsistent, the contract last executed, if valid, will supersede the first to the extent that the two are inconsistent. Ragan v. Schreffler, Mo.Sup., 306 S.W.2d 494, 498(3); Herboth v. American Radiator Co., 145 Mo.App. 484, 123 S.W. 533, 537; 17A C.J.S. Contracts § 382, page 452; 12 Am.Jur., Contracts, Section 246, page 783.

"* * * It is now perfectly clear that informal contracts, whether written or oral, can be modified and discharged by a subsequent agreement, whether written or oral. The subsequent agreement, even though it is in writing, does not discharge the previous oral (or written) agreement if it is not agreed that it shall and it is not inconsistent therewith.

"The existence and the terms of this modifying or discharging agreement can be proved by the same kinds of evidence that are admissible to prove any other kind of contract; and one denying the making or the terms of such an agreement can support his denial by the usual kinds of testimony, written or oral.

"But after these issues have been determined and the court finds, as a fact, the making and the terms of the modifying or discharging agreement, we are no longer interested in the terms of the antecedent contract for purposes of enforcement of them, in so far as those terms have been nullified by the new agreement." 3 Corbin on Contracts, Section 574, pages 372–375.

Here the appellants did testify that the sales agreement and the farm lease were executed simultaneously. If such were the case, the problem presented might be different. The trial court, however, found against the appellants on this disputed factual issue. Contrary to the testimony of the appellants, the respondent Dorothy Crouse testified that the sales agreement was first executed by the parties, she signing for her husband in his absence; that the lease was thereafter prepared and executed several hours later on the same day. Respondent Reginald Crouse testified that he was not present when the sales agreement was signed, but that he did sign the farm lease in the presence of the Berrys, his wife and Mr. Grewach. Grewach testified that the lease was executed in his presence, with all of the parties present. On the record before us, we find nothing to cause us to decline to defer to the findings of the trial court on the contradictory testimony of the appellants and respondents.

Although the time between the signing of the sales agreement and the farm lease was undoubtedly not such as would have prevented their being construed together as part of the same transaction if consistent, nevertheless, it was sufficient to show that, for the purpose of determining which of two inconsistent documents was last executed, the farm lease was the subsequent instrument. Therefore, if it was assented to by the parties as their contract,

the latter instrument must be held to prevail and to determine the rights and liabilities of the parties.

Although not wholly consistent with their contention that the two documents should be construed together, the appellants also contend, in effect, that the farm lease was invalid and unenforceable because of lack of reality of assent. They do not urge its invalidity for lack of consideration, as alleged in their reply. Nor do they press their charge that they were induced to sign the farm lease by fraudulent representations of Dorothy Crouse concerning its legal effect. In its essence, the appellants' contention is that the farm lease was so inconsistent with the prior negotiations of the parties and the sales agreement that it must not have been intended by the parties to have been given effect.

"(As) [a] general rule, absent fraud, accident or mistake, a person cannot avoid a written contract on the ground that he did not attend its terms, or that he supposed it was different in its terms, or that it was a mere form." Ragan v. Schreffler, Mo.Sup., 306 S.W.2d 494, 499(11). At the trial, when the appellant first sought to show the representations of Dorothy Crouse regarding the farm lease, an objection to the testimony was sustained and counsel made an offer of proof that the witness would testify that "Mrs. Crouse represented to (appellant) and his wife on that date that this instrument, which is entitled 'Farm Lease' did not vary the terms of their sales contract and that it was only something which was habitually signed in Lincoln County to insure that the people buying the property would take care of the property and farm the land in a workmanlike manner and that he and his wife should simply sign it for that reason, because it was a local custom to also sign this paper along with the Sales Contract." Subsequently, the court decided that the offer of proof should be by way of testimony. At that time, Mr. Berry stated, in relating what Mrs. Crouse said: "She pointed out the terms in there. She said in Lincoln County—said to me, 'In Lincoln County we make out these papers to protect the mortgagor, to plow the ground and to keep the weeds down and, well, to keep things looking nice and it is only to protect the mortgagor so that he will be covered.' Now, that is what she told me, what she pointed out on that paper to me, and also the price for taxes and insurance and interest and the payments and when they were due." Mrs. Berry stated: "She said that it was customary. She just said that it was customary to make them up here in Lincoln County. * * * It was to protect the one that had the mortgage on it, to keep the property up and keep it looking nice and in good shape."

■■■ In our opinion, this evidence was not sufficient to show that the parties executed the farm lease without intending it to be of any effect. If a written instrument, on its face, expresses a contractual obligation, one of the parties should not be permitted to avoid it on the grounds that it was never intended as such unless the evidence to such effect is cogent and convincing. 3 Corbin on Contracts, Section 573, page 361, et seq. We do not consider that this testimony and the other evidence of the circumstances surrounding the transaction are sufficient to show that the farm lease was not what, on its face, it purports to be, the contract of the parties.

The sales agreement obviously was in the terms of a sale, not of a lease with option to purchase. However, the sales agreement was also obviously not a complete contract. Although reciting a consideration of $34,500, it provided a schedule of payments reducing that obligation to only $20,000. It was silent as to what should then occur should the buyer be unable to obtain financing for that amount. The sales agreement also contained provisions which the parties did not intend to be applicable. For example, it called for the seller to tender a warranty deed on May 5, 1956. Actually, however, there was no intention that a deed be delivered at that time as other provisions of the agreement showed and

none was tendered or demanded on that date.

In view of the obvious omissions from and inconsistencies in the terms of the sales agreement, it was certainly not unreasonable for the trial court to find that the parties contemplated a later instrument to supersede the first document and that the farm lease was such superseding agreement. In our opinion, the fact that the subsequent agreement was in the form of a lease with option to purchase rather than a contract of sale does not make unbelievable that such a subsequent agreement would be made. The sales agreement was actually a contract for delivery of a deed at a future, uncertain date. A lease with option to purchase is not such a wholly foreign transaction as to preclude its use as a substituted contract for a contract of sale. Each is a well-recognized method of disposing of real property on an installment basis. See 1 CCH Fed.Tax Rep., 1964, Paragraph 668.56, page 17,185. The appellants' principal basis for contending that such a procedure is incredible apparently relates primarily to what they assume to be the difference in legal consequences in the event of a default under each of the two instruments. The appellants in effect say that, had they been aware at the time of the execution of the farm lease that the consequences of a default thereunder were such as they suffered, they obviously would not have signed the lease, but would have adhered to the sales agreement. However, this argument presupposes that, had the sales agreement been the sole contract of the parties and had the appellants made the payments thereunder which they made in this case and then defaulted, they could unquestionably have recovered the payments which they had made. Again, the law is not in accord with the appellants' basic assumption. This matter was discussed in the recent case of First National Bank of West Plains v. King, Mo., 363 S. W.2d 590, l. c. 595:

"Nevertheless, in contracts in which there is no express provision for forfeiture, 'a vendor not in default may in the event of default by the vendee, amounting to a total breach, elect not only to abandon performance on his part but also to retain as forfeited all money paid to him on the contract * * *.' 31 A.L.R.2d, l. c. 96. Also, on the theory that a party to a contract may not breach it and thereby secure some advantage to the detriment of the other party, a 'vendee who, without breach on the part of the vendor, refuses to perform a contract for the purchase of real estate, cannot recover from the vendor either the amount paid on the purchase price, or a deposit by him as earnest money or as a forfeiture; *the vendor being ready, able, and willing to perform upon his part.*' (Emphasis supplied.) Annotations 59 A.L.R. 189, 194–195; 134 A.L.R. 1064. These general rules however are subject to numerous exceptions, qualifications and limitations."

Although we do not here reach the question of whether the general rule or one of its exceptions would have been applicable had the sales agreement been the contract of the parties, there could not have been, at the time of the transaction, such an assurance of protection from loss under the sales agreement as would render a change in the transaction to a lease with option to purchase wholly improbable. Likewise, as was undoubtedly the case, even though the parties did not have the consequences of default in mind at the time of the transaction, we could not say that the difference in such consequences between the two transactions is such as to compel the conclusion that Dorothy Crouse, from her position of superior knowledge and experience, took advantage of the appellants' inexperience and lack of knowledge.

In any event, appellants do not contend that there was overreaching on the part of Mrs. Crouse such as would avoid the effect of the lease agreement. They contend that her position and her responsibility for preparation of the documents should cause them

to be construed against her when construed together. However, if the lease was the final contract of the parties, the problem is not one of construction.

The appellants assert that the trial court's finding that the subsequent conduct of the parties was in accordance with the lease and that such subsequent conduct evidenced that the parties intended the lease to supersede the sales agreement was erroneous. Of course, the court found such intention from not only the subsequent dealings of the parties, but also from the fact that the farm lease was the later instrument. "The new agreement may make no reference to the previous contract or claim; and yet it may operate as a substituted contract. If the new agreement contains terms that are clearly inconsistent with the previously existing contract or claim, the fact of inconsistency is itself a sufficient indication of intention to abrogate the old and substitute the new." 6 Corbin on Contracts, Section 1296, page 212. Ragan v. Schreffler, Mo. Sup., 306 S.W.2d 494. While there is some superficial inconsistency between Dorothy Crouse's handling of the payments which she received, particularly in her acknowledging the $750 payments of April and October, 1957, as "interest," we do not consider it to evidence that she did not regard the lease as the contract of the parties. Unquestionably, the payments under the lease were figured to provide a return in the same amount as the interest payments under the sales agreement. We do not, therefore, find that the use of such language on the receipts was wholly inconsistent with the terms of the lease.

The appellants would attach significance to Dorothy Crouse's testimony that the payments received from the appellants were not reported on her Federal income tax returns as rental income for the years in which they were received. Appellants assert that this indicates the respondents did not consider the lease as the controlling document in the transaction. We do not agree that this testimony must be given such effect. The reporting of such income is governed by standards fixed by the income tax law. For purposes of that law, the parties' designation of the transaction is immaterial. Apparently, when a lease with option to buy confers an equity in the property, the transaction is, for income tax purposes, a sale, regardless of what the parties call it. Haggard v. Commissioner of Internal Revenue, 9th Cir., 241 F.2d 288; Beus v. Commissioner of Internal Revenue, 9th Cir., 261 F.2d 176. Mrs. Crouse's tax advisor may well have concluded that such rule applied in this case and have prepared her tax returns accordingly.

On the entire record, we do not agree with the appellants that the evidence did not warrant the finding that the lease was intended by the parties as the final terms of their contract. We acknowledge, as is obviously the case, that the parties, prior to executing the lease, had dealt in terms of an installment sale of real estate. However, there is no prohibition of law or public policy forbidding the substitution of a lease with option to buy for such an arrangement. The instrument which the appellants executed shows clearly that it was a lease. They admit the execution of the instrument and in our opinion the reasons urged by the appellants are not grounds for avoiding its effect. Effective, it is the contract of parties sui juris and we cannot change or disregard it in order to give effect to what might be our ideas of fairness or equity.

The judgment is affirmed.

COIL and HOUSER, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.