**ASSOCIATED CEMETERY MANAGEMENT, INC. EMPLOYEES' PROFIT SHARING TRUST, et al., Respondents,**

v.

**Bruce BRENT et al., Respondents,**

v.

**Florence P. WILLIAMS and United States of America, Appellants.**

**No. 55744.**

Supreme Court of Missouri,
Division No. 1.

Nov. 13, 1972.

Motion for Rehearing or Transfer to Court En Banc Dec. 11, 1972.

Oscar S. Brewer, Whitney F. Miller, Kansas City, for respondents; Hillix, Brewer & Myers, Kansas City, of counsel.

Daniel L. Brenner, Fred J. Petzold, Kansas City, for appellant Florence P. Williams; Brenner Lockwood & O'Neal, Kansas City, of counsel.

Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Joseph H. Reiter, Richard Halberstein, Attys., Tax Division, Department of Justice, Washington, D. C., for appellant United States.

SEILER, Judge.

In 1955, Mr. and Mrs. E. L. Williams were divorced. The property settlement and the decree provided for alimony payments to Mrs. Williams of $500 per week for her life. The litigation before us is concerned mainly with (1) whether Mrs. Williams has lost her security rights in certain stock pledged for the alimony, and (2) is the stock subject to a federal income tax lien against Mr. Williams. The trial court ruled yes on the first and no on the second.

Mr. Williams was in the business of operating cemeteries. He agreed to pledge stock in his cemetery corporations to secure the alimony payments. Later, he wanted to sell the stock to an employees' profit sharing trust to be created by some of his associates. The consideration was to be $2,400 in cash and a $2,122,600 promissory note from the trust.[1]

Mrs. Williams agreed to release the stock to be sold, on condition that out of the payments to be made by the trust to Mr. Williams on the note, $500 per week would be disbursed to her instead of to Mr. Williams until her death or payment to her of $250,000 taken from the excess of annual note payments by the trust above $100,000, whichever occurred first. In event of default, the stock was to be delivered to Mrs. Williams, who would have the stock reissued in the name of Mr. Williams and by her foreclosed as collateral security under the original pledge agreement. These provisions were contained in two documents: one an agreement between Mr. and Mrs. Williams made September 24, 1956 and the other in what was called "collateral pledge agreement", made February 18, 1957.

Matters did not go smoothly financially. Another employee foundation established by Mr. Williams claimed prior ownership of much of the cemetery stock. It turned out that Mr. Williams and business associates had "borrowed" most of the money which the cemetery corporations were supposed to have set aside to provide services upon death of those who had made prepayment for such services. Creditors were asserting claims against the cemetery corporations.

Some of the trustees applied to the court for guidance and a receiver was appointed. By February 1958, the affairs of the cemetery corporations were in chaos, the trust was in default on its note, and Mrs. Williams was not receiving her $500 weekly payments. She was threatening litigation, which the trust desired to avoid, as it had neither the resources nor personnel to litigate, so the two entered into a standby agreement. Mrs. Williams agreed that if the trust would pay her $200 per week for 118 weeks and $300 per week thereafter for life until $250,000 was paid, she would forebear asserting any indebtedness against the trust arising out of the note or requiring that Mrs. Williams assert rights for her benefit under the various prior contracts. If the payments ceased, both the trust and Mrs. Williams would be restored to their respective positions (except for payments made). The trust agreed, while insisting that it denied that any of her rights existed.

The trust then paid Mrs. Williams $200 per week for 118 weeks and $300 per week for the next 415 weeks, until June 3, 1968, when the payments ceased. Altogether, Mrs. Williams received $148,400 from the trust under the standby agreement.

In the meantime, the court directed that all claims against the trust be filed or be forever barred. Mrs. Williams made claim for $101,600. The United States made claim for a tax lien against the cemetery stock held by the trust for unpaid income taxes due from Mr. Williams. After an

---

1. It is apparent there was little hard cash displayed or advanced and equally apparent that the successful carrying out of the complicated undertakings referred to herein depended entirely on the continuing generation of a large amount of income by the cemetery corporations.

evidentiary hearing, the trial court denied the claims of Mrs. Williams and the government. Both appealed. We have jurisdiction because of the amount in controversy, since the appeals were pending here on January 1, 1972.

The receiver had asked the court to determine all claims and liens upon property of the trust. Mrs. Williams asserted in her claim that there was still due her $101,600 under the collateral pledge agreement and that she had a first lien on all the cemetery stock held thereunder. She asked for judgment against the trust for the $101,600 and a declaration that she was the owner of the stock and the $2,122,600 note.

The United States contended it was entitled to a lien on the cemetery stock, claiming that although the stock had been purchased by the trust, the transfer occurred after the federal tax lien had attached to the property of Mr. Williams.

In the trial Mrs. Williams was contending the trust was obligated to make the payments to her until $250,000 was paid and that the cemetery stocks were collateral for the payment. She asked the court to order the stocks sold to pay her $101,600 claim and also for a judgment against the receivership estate for any deficit. Mrs. Williams took the position that the standby agreement did not cancel any of the prior agreements.

Some five months after the hearing closed, Mrs. Williams moved to amend her claim, which the trial court refused to permit. While continuing to maintain that she had a lien on the cemetery stock, Mrs. Williams sought to raise the amount for which she sought judgment from $101,600 to $159,600, contending she was entitled to receive $500 per week from the trust as long as the default in payment by the trust continued. In effect, she was asserting by her proposed amendment that the trust was obligated under the standby agreement to go on paying her indefinitely. At the hearing, her position had been that what she was entitled to was $101,600 plus interest, representing the balance due on her $250,000 claim. In refusing the amendment the trial court pointed out that it was late and constituted a change from the original claim. Additionally, the trial court found in its conclusions of law that the standby agreement "contains no promise by the Trust to pay any sum of money to Florence P. Williams and created no debt or obligation of any kind running from the Trust to Florence P. Williams." We agree with the trial court's conclusion. The standby agreement was for the purpose of forestalling litigation during the time payments continued. Once payments ceased, the parties returned to the original status quo, except for payments made during the interim. In fact, at the hearing on the motion for new trial, Mrs. Williams' counsel acknowledged his agreement with the above finding of the trial court.

The receiver asks that Mrs. Williams appeal be dismissed, asserting she is trying to litigate here on a theory different from that pursued below. It is true Mrs. Williams asserts novation and partial assignment in her brief, theories not mentioned below and therefore not available here. But her basic theory, both here and below, is that she has a lien or security interest in the cemetery stock which survived the sale of the stock to the trust and the financing plan used by Mr. Williams and the trust to pay for it. We therefore decline to dismiss the appeal and will consider the lien claim on the merits.

We are convinced the trial court erred in its conclusion and finding that Mrs. Williams does not have a lien upon the cemetery stocks held by the bank.

From the outset Mrs. Williams and counsel were at pains to insure collateral security for the alimony which Mr. Williams had agreed to pay her at $500 per week for her life. On July 1, 1955, he agreed by written contract to turn the cemetery stock over to Mrs. Williams' attorney to be held as collateral security

for payment of the alimony. On default, Mrs. Williams was authorized to withdraw from the escrow whatever number of shares she considered necessary to make up the default.

Then Mr. Williams decided to sell the stock, provided he could induce Mrs. Williams to release it. On September 24, 1956, they entered into another agreement. By this agreement, Mrs. Williams agreed to release the stock for sale to the employees profit sharing trust, but also for delivery to a bank as escrow and collection agent. Mrs. Williams was to receive $500 per week from the payments to be made to Mr. Williams upon the note to be executed by the trust until her death, or until she had received $250,000 from a trust fund which was to be built up from 25% of the excess over $100,000 of the total annual prepayments made by the trust on the note, or until default on the note. On default the bank, despite any provision in the contract of sale to the contrary, was not to deliver the stock to Mr. Williams, but rather to Mrs. Williams to be held as collateral security under the above mentioned July 1, 1955 agreement. The stock was to be reissued in the name of Mr. Williams, who was to furnish Mrs. Williams with signed stock assignments in blank and failing to do so, Mrs. Williams' attorney was constituted attorney in fact to execute the stock transfers in Mr. Williams' name.

On February 18, 1957, Mr. Williams and the trust executed the above mentioned collateral pledge agreement. This called for disbursements by the bank to Mrs. Williams of $2,000 every four weeks until her death, or until she was paid $250,000 from the trust fund, or until final default on the note. The bank was denominated escrow agent and pledgeholder and in event of default under the note was directed to foreclose by delivery of the certificates to Mrs. Williams, together with blank assignments, unless the death of Mrs. Williams had occurred or she had received $250,000 from the trust fund. If the certificates were delivered to Mrs. Williams, the note executed

by the trust, which was in the amount of $2,122,600, was to be marked "Cancelled" and returned to the trust.

Thereafter, as earlier indicated, the standby agreement of February 24, 1958 was entered into, but this agreement in no wise discharged the earlier agreements and specifically provided that in event of default in the payments the parties would be "fully restored to our respective positions as of this date."

Mrs. Williams had a pledge lien on the cemetery stock held by her lawyer pursuant to the agreement of July 1, 1955, executed to assure her that Mr. Williams would meet his alimony obligations. "Where the chattel is in the possession of a third person a pledge may be created by assent of the pledgor and notification by either pledgor or pledgee, to the third person, that the chattel has been pledged to the pledgee." Restatement, Security, Sec. 8, p. 22; National Bank of Commerce v. Flanagan Mills & E. Co., 268 Mo. 547, 188 S.W. 117, 121; 72 C.J.S. Pledges, § 19(6), p. 23.

It is clear from the agreement between Mr. and Mrs. Williams made September 24, 1956, and the collateral pledge agreement of February 18, 1957, that Mrs. Williams retained her lien interest when the stock was given to the bank as escrow agent and pledgeholder. In the event of default by the trust, the stock was not delivered to Mr. Williams but directly to Mrs. Williams, who was to cause it to reissue in Mr. Williams' name with the blank endorsements and she had the power of attorney to do so if Mr. Williams refused to cause the transfer himself. Under these conditions, Mrs. Williams did not lose her lien on the stock.

The cause must therefore be remanded as to Mrs. Williams for the trial court to determine how much is owing from Mr. Williams to Mrs. Williams on the alimony payments, with a lien to be declared upon the cemetery stock to the extent required

to satisfy the amount due. In arriving at the amount due, Mr. Williams, or the trust in seeking to reduce the amount of the lien upon the stock which it has purchased, would be entitled to credit for any amounts paid Mrs. Williams by Mr. Williams or on his behalf as alimony payments, weekly or otherwise, not limited to the payments made by the trust.

■ As to the government's tax lien claim, the trial court denied it on the basis that Mr. Williams had bona fide agreed to sell the stock for a valuable consideration to a purchaser for value—the trust—before the tax lien attached.[2] This relates to the contract of August 10, 1956 made between Williams and the trust and others by which Williams agreed to sell the stock and it was agreed the trust would buy, subject to Williams making arrangements with Mrs. Williams to release the stock from escrow with her attorney.

Briefly, under the August 10, 1956 contract, a group of service cemetery corporations controlled by Williams sold their assets to an operating company. Williams agreed to have his cemetery corporations pay the operating company 98% of the revenues in return for management services and agreed to sell the cemetery corporation stock to a tax exempt profit sharing trust to be created by the operating company. Mr. Williams agreed not to compete in the cemetery or mausoleum business in the United States for ten years. The operating company obligated itself to the trust in sufficient amounts to pay the trust's obligation to Mr. Williams.

The government argues the August 10, 1956 agreement was no more than "an agreement to agree" with specified conditions precedent. We are of the opinion, however, that the requirements set forth in the agreement are covenants of the parties enforceable against the party who might breach one of them.

United States v. Boston & Berlin Transportation Co. (D.N.H.), 188 F.Supp. 304, is directly in point. In that case one Lavigne contracted with the defendant to purchase his trucking business for $27,000. Title to the business could not pass until the I.C.C. approved the sale. The purchase price was not to be paid until the sale was completed and title passed. Before title passed the government placed a lien on the business for taxes. The government contended that the original contract was merely an "agreement to agree" with conditions precedent and the purchaser took subject to the lien since title and the purchase did not change hands until the I.C.C. gave approval. The court rejected that view.

In the case at bar the same problem occurs. Here we have a case where a prompt and immediate closing was impossible. Numerous technical arrangements had to be worked out between the parties and third parties, but as the court said in the Boston & Berlin Transportation case, 188 F.Supp. at 306: ". . . The approval . . . was not a condition precedent to the validity of the contract because the parties were under an obligation to attempt to secure such approval . . ."

While the operating company and the trust did not have title to the stock as of August 10, 1956, there was certainly an interest in the property on that date within the meaning of Treas.Reg.Sec. 301.6323–1(a)(2)(i)(a).[3]

The government's contention that full and adequate consideration was not given until February 18, 1957 is without merit in

2. 1954 Internal Revenue Code, Title 26 U.S.C., Sec. 6323(c)(1) defines when the notice of a lien provided in Sec. 6321 shall not be valid in the case of securities: ". . . as against any . . . purchaser of such security, for an adequate and full consideration in money or money's worth, if at the time of such . . . purchase such . . . purchaser is without notice or knowledge of the existence of such lien."

3. Treas.Reg. Sec. 301.6323(a)(2)(i)(a) states: ". . . (i) As used in Sec. 6323 and this section: (a) The term 'purchaser' means a person who, for a valuable present consideration, acquires property or an interest in property . . ."

light of United States v. Boston & Berlin Transportation Co., supra, and Treas.Reg. 301.6323–1(b)(1): ". . . An adequate and full consideration in money or money's worth, as used in Sec. 6323(c), means that the consideration must have been adequate and full equivalent reducible to a money value. A purchase of property made in the ordinary course of business (that is, a transaction which is bona fide and made at arm's length) will be considered as made for an adequate and full consideration in money or money's worth . . ."

The judgment of the trial court is reversed as to the claim of Florence P. Williams and remanded with directions to recognize her lien against the cemetery corporation stocks held under the collateral pledge agreement of February 18, 1957 and to conduct a new hearing to determine the amount of alimony remaining unpaid, and is affirmed as to the claim of the United States of America.

BARDGETT, J., and JENSEN, Special Judge, concur.

HOLMAN, P. J., not sitting.