**FIRST NATIONAL BANK OF WEST PLAINS, Missouri, (Plaintiff) Respondent,**

v.

**I. N. KING and Sarah Lee King, His Wife, (Defendants) Respondents,**

**Harold E. Reed and Dorothy M. Reed, His Wife, (Defendants) Respondents,**

**Buck Pennington and Evaleen J. Pennington, His Wife, (Defendants) Appellants.**

**No. 49307.**

Supreme Court of Missouri,

Division No. 2.

Jan. 14, 1963.

Richard D. Moore, Hogan & Hogan, Robert E. Hogan, West Plains, for appellants.

Esco V. Kell, West Plains, for respondents I. N. and Sarah Lee King.

Green & Green, H. D. Green, West Plains, for respondents, Harold and Dorothy M. Reed.

BARRETT, Commissioner.

This proceeding, initiated as an action for a declaratory judgment as to the duties of an escrow agent and the rights of the parties under a real estate contract, has now become a suit to quiet the title to real estate, an action for money had and received by reason of unjust enrichment and a suit of a general equitable nature including an accounting and an adjustment of rights between the parties. It is necessary to a complete understanding of the issues upon this appeal therefore to detail the background in which the litigation originated.

Buck and Evaleen Pennington and Harold and Dorothy Reed came to West Plains from the State of California in December 1959. It is not known whether any of them had had any previous acquaintance with Howell County or any prior experience with farming in Southwest Missouri or elsewhere. Buck and Mrs. Reed are brother and sister. The Reeds have three children and the Penningtons two. Almost immediately upon their arrival and for undisclosed reasons they entered into a written contract with I. N. and Sarah King to purchase their 300 acre farm for the price of $15,000. The signed contract was deposited with the First National Bank of West Plains as escrow agent for all the parties and upon fulfillment of the agreement the bank was to deliver the deposited deed to the Penningtons and Reeds, conveying to each couple a one half interest by the entirety. Upon the signing of the contract the purchasers, contributing equal sums, paid the Kings $1,000 and on January 1, 1960, made an additional payment of $5,500 and went into possession of the farm. There was a secured loan from the Federal Land Bank on which there was a balance due of $3,031.35, payable $159.33 a year together with 4% interest. The purchasers assumed and agreed to pay that obligation. This left a balance due on the purchase price of $5,468.65 and this sum the purchasers agreed to pay to the Kings in annual installments of $540.67 together with 6% interest on the unpaid balance.

In addition to the Reeds' and Penningtons' contract with the Kings there was also an agreement and certain transactions among themselves. While not clearly spelled out in terms, the basic idea appears to have been that they would jointly, perhaps even in a full partnership, pay the purchase price, jointly improve, jointly operate and equally share in the expense and ultimately jointly own the farm and equally share in its profits. To initially carry out these purposes and particularly to start farm operations it was agreed that the Reeds and Penningtons would contribute equal sums to be deposited in a joint bank account. When the time came, however, Buck Pennington had no money and could not immediately furnish his half of the cash. They "put in * * * $50.00 apiece for groceries" and by the time they got to the bank "that was the end of my money." Nevertheless, Reed deposited, according to Buck, $600 in their joint names and $600 in his own account. Reed says that he deposited $1,000 in their joint account and $700 in his own account "which I later spent for things that weren't to be itemized, or deductible in that way, like operations and things of that nature." It was anticipated that the Penningtons would sell their property in Atascadero, California, at which time they would contribute their proportionate share to the bank account.

In any event, the Reeds and the Penningtons all moved into the unimproved farmhouse. From the joint bank account, according to Buck, they spent about $600 for lumber, general repairs and modernization of the house. They bought one cow, ten pigs and two hundred chickens. They sold a neighbor standing timber for which they received $300, each of them took $50 and Buck bought groceries, he does not know what became of the other $200. But in less than thirty days the Reeds and Penningtons were unable to get along with one another, for some reason they avoided a recitation of "the particulars" of their disagreement, and Buck decided that he would rather live in Cali-

fornia. He sold their furniture to the Kings' son-in-law and on February 8, 1960, returned to California. The Reeds stayed on and during the year 1960 attempted with most indifferent success to operate the farm.

During the year 1960 there were no further payments due under the contract with the Kings, but in January 1961 total payments of $868 were to be paid the bank. Reed says that a week before these payments were due he called Pennington in California and Pennington said that he would be in Howell County in ten days and would "settle things." Buck claims that all the while he and Reed were negotiating with one another to either buy or sell their respective interests in the farm. But Reed's demand was for $5,500 which Buck thought was more than he had in the farm and so he "left it hanging there." He says, however, that both King and Reed knew that he had made an agreement to sell to some "third party." And a man did talk to Reed, but "I advised him I was in a lot of trouble" and "if he wanted to go into something like that, he'd be in the same water with me." King says that it was a day or so after he had resold the farm to Reed that this man talked to him about buying Buck's interest. In any event, Buck returned to West Plains on January 27, 1961. He did not see or communicate with the Reeds. He did talk to Mr. King and admittedly informed him that he had returned with the intention of making his half of the payment but after returning had changed his mind and "decided to let the whole thing go." King's version of the conversation was that Buck came in and wanted to know how "I'd like to have * * * his part of the farm back, and I told him I didn't want it * * * and he said, 'Well, I am going to turn it back to you, anyway. * * * I brought the money with me, but I had a change of heart. I am not going to pay it.'" And, King says, "he gave me a reason—he said he couldn't make a living here in Missouri, and he couldn't get nothing off of the place if he stayed here, and he was just going

to turn it back to me and have no more to do with it and was washing his hands clean of it * * *." Buck's interpretation of this particular episode was this: "Well, I was so disgusted with it, I didn't want to keep putting money into it and not get anything back. When I got back here, it was about six below. I was cold and disgusted and I thought I'd just let it go." The upshot was that Pennington returned to California without tendering any of the payments then due on the contract.

Definite dates and terms were not established, whatever documents, contract or deed, may have been executed were not offered in evidence. But King says that on February 18, 1961, he sold the property to the Reeds. A mutual release was executed and the Reeds executed and gave King a quitclaim deed, and, according to Harold Reed, the Kings entered into a new contract selling the property to the Reeds for the original price of $15,000; "Of course, with the down payment taken into consideration." Some time after this transaction Harold Reed made a trip to California and it was then that Pennington learned that the Kings had resold the property to the Reeds. And on March 8, 1961, Pennington telegraphed $434.40 to the bank in West Plains, one half the sum due under the original contract in January. But the Kings' lawyer had instructed the bank to not accept any payments from the Penningtons and when the case was tried in October 1961 the bank had the Western Union check.

In the face of these events the First National Bank, as an escrow agent with no personal interest in the outcome, instituted this action for a declaratory judgment as to its duty and "to adjudge and define the rights of the parties defendants in and to said real estate and their rights under said contract." The first parties to respond to this pleading were the Kings and on April 3, 1961, they filed an "interplea." In this pleading they admit several of the allegations set forth in the declaratory judgment petition. They admit the payment of $6,500

on the original contract but assert that no payments were made after 1959 (they must mean after January 1960) and that therefore the purchasers were in default. The Kings then purport to set forth in the interplea a "claim" against the Penningtons. In this phase of the pleading they state that the Reeds and Penningtons failed to make the payments due on January 1, 1961, and therefore were in default. They allege that the Penningtons informed them that they did not intend to make the payments and returned a "written declaration" to that effect as well as "the stock certificate of their interest in said land" and by this action it is said they are estopped to assert an interest in the land. In this connection the Kings also alleged that the Reeds had executed and delivered to them "their title and interest in said land." Their prayer for relief was an adjudication that the contract of December 3, 1959, be forfeited and that "all interest and title conveyed by said contract is vested" in them.

On August 14, 1961, the Penningtons responded with an answer, a separate interplea and a counterclaim against the Kings in which in general the right to a forfeiture of the contract is denied. In the interplea the facts as they have been previously outlined in this opinion were set forth, including the tender of $434.40, the second purchase of the farm by the Reeds, the Reeds' continuous possession of the farm, its leasing and the sale of crops and timber. The Penningtons' prayer for relief was for a decree of specific performance of the contract by the Kings or in the alternative that they be required to "reimburse defendants * * * the sums said defendants have paid under the terms of said contract," $3,693 plus the tendered $434.40. As against the Reeds the Penningtons asked for an accounting of rents, receipts and the sale of timber.

On August 23 the Reeds responded with an answer to all claims and a counterclaim against the Penningtons. In general the answer and counterclaim set forth the substance of the facts as they have thus far been narrated in this opinion. They allege, however, payments to which the Penningtons have made no contribution including their original bank deposits of $1,700 and in addition they assert the Penningtons' failure to carry out other agreements. They too allege the Kings' forfeiture of the contract and their purchase from the Kings in which they "received no credit for any part of the Penningtons' original payments." Aside from a request for the dismissal of Penningtons' claim their prayer is for a declaration of the Penningtons' default and consequently of a forfeiture and finally a decree that they "are now the sole owners of the real estate" subject only to their present indebtedness to the Kings.

The trial court found that for a valuable consideration the Reeds and the Penningtons had voluntarily rescinded the original contract of purchase with the Kings. The court therefore required the Kings to return to the Penningtons their note and deed of trust (which, incidentally, was not introduced in evidence). The court directed the return of their $434.40 Western Union check. The court required the Penningtons to endorse and deliver to the Reeds two insurance checks, $115 and $48.52, for windstorm damage to the barn. At the same time the Reeds were required to pay the Penningtons $250, one half the price of all timber sold during their joint ownership of the farm. The court denied Penningtons' counterclaim, found that they had voluntarily rescinded the contract and were therefore not entitled to specific performance. And finally the court found and decreed that the Reeds were the owners "in fee simple title of the lands."

The Penningtons alone have prosecuted an appeal to this court. Their brief and argument is directed almost wholly to that part of the decree which denies to them any relief whatever against the Kings. It is only in this inferential manner that their appeal concerns the Reeds. They claim that the court erroneously found a repudiation of the contract and assert that their failure to timely make or tender the pay-

ments due in January 1961 would not work a forfeiture. They claim that they were erroneously denied specific performance because the Kings had not offered to restore the status quo and had attempted to rescind the contract while retaining all its benefits. And finally it is claimed that it was "wholly unfair and completely inequitable to allow the vendor(s) (Kings) to retain the purchase price paid by appellants, after rescission, when the vendor(s) had no damage." Against this claim the Kings urge that by word and deed the Penningtons rescinded the contract and consequently are not entitled to either specific performance or a return of their part of the purchase price. The Reeds have joined with the Kings in this phase of the appeal, of course, and claim an abandonment and release of the contract. In addition the Reeds "earnestly contend" that the court erroneously found them indebted to the Penningtons in the sum of $250 on account of sale of the timber.

It has been deemed necessary to thus recite these details of pleading and of fact to point up the uniqueness of the case and the problems distinguishing it from all other cases. As indicated, many important documents together with their dates and terms—such as the Reeds' second contract of purchase—were not offered in evidence. However, the original contract of purchase, between the Kings as sellers and the Reeds and Penningtons as purchasers, was offered in evidence, it was of course the basis and subject of this suit. In addition to the terms previously noted, the contract of December 3, 1959, does not expressly provide for a forfeiture of the contract or of payments made under it for failure to make payments when due. Neither is it provided that time of payment is of the essence of the contract. Instead this contract provides that if the purchasers fail to make payments when due the bank is authorized to return the deed to the sellers and the purchasers "shall become the tenants of the First Parties" and the sellers shall have the right to repossession of the prop-

erty upon giving thirty days' notice in writing. Obviously this is not an express provision that upon the vendees' default and breach of the contract the vendors may "retain as forfeited all money paid on the contract." Annotation 31 A.L.R.2d 8, 34–38.

Nevertheless, in contracts in which there is no express provision for forfeiture, "a vendor not in default may in the event of default by the vendee, amounting to a total breach, elect not only to abandon performance on his part but also to retain as forfeited all money paid to him on the contract * * *." 31 A.L.R.2d, l. c. 96. Also, on the theory that a party to a contract may not breach it and thereby secure some advantage to the detriment of the other party, a "vendee who, without breach on the part of the vendor, refuses to perform a contract for the purchase of real estate, cannot recover from the vendor either the amount paid on the purchase price, or a deposit by him as earnest money or as a forfeiture; *the vendor being ready, able, and willing to perform upon his part.*" (Emphasis supplied.) Annotations 59 A.L.R. 189, 194–195; 134 A.L.R. 1064. These general rules however are subject to numerous exceptions, qualifications and limitations. It is not necessary here to carefully note all the distinctions, it is sufficient to briefly indicate the nature of some of the limitations. If there is no express provision for a forfeiture the mere default of the vendee as to timely payments does not work a forfeiture (Plymouth Securities Co. v. Johnson (Mo.), 335 S.W.2d 142, 152), "some act or word in assertion of forfeiture being necessary to such a result, unless the circumstances peculiarly excuse it." 31 A.L.R.2d, l. c. 112. This rule too has its qualifications, the vendor is excused from affirmatively declaring a forfeiture if the vendee in addition to his default labors under a misconception of his rights or expressly announces an abandonment of the contract. 31 A.L.R.2d, l. c. 114, 122; Leon v. Barnsdall Zinc Co., 309 Mo. 276, 274 S.W. 699. On the other hand,

rescission usually contemplates a restoration of the status quo (Austin & Bass Builders, Inc. v. Lewis (Mo.App.), 350 S.W.2d 133) and, as indicated, readiness to perform is a prerequisite and the vendor's immediate sale of the property to a third person may alter the matter, particularly if it constitutes a rescission. 31 A.L.R.2d, l. c. 125. The vendor does not render himself liable to account "at leas(e), where his act is a step in forfeiting the contract for the default of the vendee, and is done after giving notice of forfeiture, or making a demand for payment and giving notice of his intention to forfeit the contract if such demand is not complied with." 59 A.L.R., l. c. 209. Although the facts were not comparable to the circumstances of this case these generalities have been recognized and applied in several cases in this jurisdiction. Norris v. Letchworth, 167 Mo.App. 553, 152 S.W. 421; Chamberlain v. Ft. Smith Lumber Co. (Mo.App.) 179 S.W. 740; Haynes v. Dunstan (Mo.App.) 104 S.W.2d 1025; Bennett v. Adams (Mo.App.) 238 S.W.2d 442. The courts as well as others have not always been consistent in the development and application of the rules, some of the criticisms may be noted in 59 A.L.R., l. c. 215, 134 A.L.R., l. c. 1066 and 31 A.L.R.2d, l. c. 15, 127–128.

It is not necessary here to examine the rationale of the rules or to attempt a reconciliation of the cases, this case does not plainly fall within either the cases or the rules. The Kings do not purport to have followed the terms of the contract, they did not give thirty days' notice and treat the purchasers as tenants and they did not assert the right to repossession of the premises. Neither did they in the conventional manner assert a forfeiture. On the other hand, as far as the Penningtons were concerned, compliance with the contract and the general rules may have been excused on their part because Buck Pennington notified the Kings that he was disgusted, did not intend to make the payments and that "I'd just let it go." In this connection and no doubt to carry out this purpose a quitclaim deed

was mailed to the Penningtons in California. Buck and his wife signed the deed and mailed it to the bank in West Plains but they had not acknowledged the instrument and so it was again returned to them for complete execution. This time they simply retained the incompleted deed and left it in California when Buck came back to West Plains for the trial. As a part of the original transaction the Kings had endorsed to the Reeds and the Penningtons a "receipt for stock" in the National Farm Loan Association. Buck and his wife endorsed this certificate adding, "I Buck Pennington turn back to I. N. King and Sarah Lee King my interest in said stock." In the letter transmitting the certificate Buck added, "Also you are entitled to half of the corn and Hay and whatever came out of the timber." From this and other conduct it would appear that the Penningtons once treated the contract as abandoned as far as they and the Kings were concerned but again in this their obligations to the Reeds were ignored.

The difficulty in adjusting the rights of all the parties to the original contract arises however in what the Kings and Reeds, independently of the Penningtons, subsequently did. It was said, when the January 1961 payments came due, that the Reeds did not tender the sums due or make their proportionate part of the payments. Because of their failure to make the payments it was said that they also were in default. And, on February 18, 1961, the Kings and the Reeds entered into a mutual release (59 A.L.R., l. c. 218) of the original contract and the Reeds quitclaimed their interest in the farm to the Kings. The release does not refer to the $6,500 payments on the original contract and neither the new contract nor the new deed were offered in evidence. Reed says that his second purchase of the farm was for $15,000, "Of course, with the down payment taken into consideration." Reed testified that the quoted language meant "just my portion of it," that is, his portion of the down payment. He repeatedly insisted that in the

new contract of purchase he did not receive credit for any sum the Penningtons had paid to the Kings under the original contract. Here, it may be noted, that the second sale to the Reeds is unlike the sales in any of the cited cases. The Kings did not retake possession of the property and then make a sale to a third party, a stranger to the original transaction (59 A.L.R., 1. c. 209), the second sale was to one of the original contracting parties.

King says that when Reed informed him that Pennington was not going to make the payments, Reed "didn't know what to do. *He had his money for his half.*" So King replied to Reed, "Well, Mr. Pennington wants to default; let him default. You won't need to lose your part because he did his. In other words, *I just guaranteed him his equity in the farm.*" In describing the second sale and his agreement with the Reeds, he said, "I just added Mr. Pennington's loss onto Mr. Reed's loan. He gave me a down payment on that, on the deed of trust, and a mortgage for the rest of—Q. You mean you added Mr. Pennington's loss onto Mr.—A. Well, Mr. Pennington defaulted. The Court: You mean that, Mr. King, that the balance Mr. Pennington owed on the obligation, you added it onto Reed? The Witness: That is right." Later Reed said, "He gave me credit for the original down payment, but he didn't give me credit for Buck's half. The Court: He just gave you credit for what you paid? The Witness: That is right. The Court:—although he had collected from Mr. Pennington? The Witness: It is true. I didn't want any—anyhow, it was a family affair, so I didn't push—The Court: So, what you are doing, you are just picking up the payments that you and Pennington both owe? The Witness: No, I am picking up—The Court:—plus part of that that Pennington paid in? The Witness: Yes. * * * Mr. Green: What the Judge wants to know, and I want to, if I have got it clear, did you get any credit on the place for anything Pennington had paid on the place? The Witness: No credit at all."

■ These are indeed ambiguous explanations, even if indisputable documentary evidence is unavailable, King and Reed know and can establish beyond doubt whether King gave Reed credit for any part of the Penningtons' initial payments on the purchase price. This is important not alone as a matter of truth and fact but for its bearing on the general rules with respect to the law of vendor and vendee. In the second transaction Reed and King apparently ignore Pennington. Because of the Penningtons' default the Kings forfeit their partial payments. At the same time, because of the Reeds' default, the Reeds and Kings mutually rescind the contract and then, consistently with the theory of rescission (but contrary to the theory and effect of forfeiture), give Reed credit for the payments he had made on the original contract. This not only presents an irreconcilable inconsistency of theories, but if in the second sale King charged Reed $15,000 for the farm, King will have had the unaccounted for windfall of the Penningtons' payments because he does not claim to have sustained other than nominal damages by reason of Penningtons' default. It is also in this respect that the case is unique—that the seller rescinds as to one joint purchaser and forfeits as to the other. In these circumstances the Penningtons are obviously not entitled as a matter of right to specific performance of the original contract. But for the reasons indicated and in these unique circumstances they are entitled to an accounting for that part of the $6,500 paid by them and received by the Kings.

■■ This view of the controversy does not resolve the remaining Reed—Pennington problems. It would be most unreasonable to permit Pennington to breach if not repudiate what he seems to consider his severable part of the contract with the Kings and thus compel the Reeds either to buy his interest in the contract on his terms or likewise breach the contract with the Kings and run the risk of forfeiting not only their share of the down payments but also their expenditures in improving and

operating the farm. Pennington claims that when he left Howell County in February 1960 he and the Reeds understood that they were no longer in "partnerships on paying for the livestock or the farming operation." But of course he may not so readily rid himself of his contractual obligations, he too is in the inconsistent position of seeking enforcement of the contract against the Kings but at the same time ignoring his relationship to the Reeds. Pennington, admittedly, has not kept his bargain with his brother-in-law from the start. He did not make his half of the deposits in the joint bank account and he has made no contribution in either effort or money to the cost of operating or improving the farm. When he made a tender of one half of the payments due on the purchase price in March 1961, he did not at the same time offer to comply with his bargain with the Reeds and share in the expenses, burdens and losses. But, as indicated, these are all matters of an adjustment of rights and an accounting between the Reeds and the Penningtons. Normally upon this appeal there would not only be a review de novo but this court would find the facts and ultimately give such judgment as "shall seem agreeable to law." Sup.Ct. Rules 73.01(d), 83.13 (c), V.A.M.R. The Penningtons, understandably, do not complain of the judgment in so far as it relates to their problems with the Reeds, but as between these parties there was not a full-scale trial of the merits. The consequence is that upon this record it is not possible for this court to confidently find the facts and justly dispose of all the issues between the Reeds and the Penningtons. The final result of such an adjustment and accounting, either in this court or upon another trial, may not differ materially from the judgment already entered by an experienced trial judge. Nevertheless, if the parties insist upon the resolution of their rights by litigation, it does not appear that all the available, relevant facts have been presented or that all of the Reed-Pennington problems have been considered.

For the reasons indicated, the judgment is reversed and the cause remanded for such further action as the parties may deem necessary and appropriate.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.