JOPLIN CMI, INC., Plaintiff-Appellant,

v.

SPIKE'S TOOL AND DIE, INC., and Oscie-Ora Acres, Inc., Defendants-Respondents.

No. 14360.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 14, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 3, 1986.

Application to Transfer Denied Dec. 16, 1986.

6. Footnote 3, *supra*.

Charles Buchanan, Joplin, for plaintiff-appellant.

Albert D. Johnston, Johnston & Carlton, Carthage, for defendants-respondents.

NORWIN D. HOUSER, Senior Judge.

Action on a written contract captioned "Option to Purchase Real Estate" dated May 4, 1973, in which for a consideration of $100 Optionor Spike's Tool and Die, Inc., a corporation, (hereinafter "Spike's") gave Optionee Ronald Walker the option to purchase Oscie Acres, a parcel of real estate in Jasper County containing approximately 608 acres, and to pay $800 an acre as follows: $25,000 on the date the option was exercised, $50,000 on October 1, 1973, and thereafter the minimum sum of $20,000 annually, "the first installment due on the 10th day of October, 1974, and a like sum due on the same date of each succeeding year, the remaining balance, if any, payable in full on October 10, 1983."

Paragraph 3 provided that Optionor "on receiving payments of cash * * * mentioned herein shall execute and deliver to Optionee a Warranty Deed for that portion of real estate paid for in cash, the Optionee having the right to select the particular acres to be conveyed which lie above 880 feet above sea level, the Optionor having the right to select the particular acres to be conveyed which lie below that level; "that Optionor will convey to Optionee at various times portions of the above described real estate, by General Warranty Deed, on the occasion of each cash payment * * * the number of acres to be conveyed on each such occasion to be determined by dividing" 800 into the said cash payment. Optionee was required to purchase one acre of the lower land for each acre chosen by Optionee from the upper land, until Optionee purchased 200 acres of lower land, after which Optionee might, at his election, select and purchase any remaining acres from either the upper or the lower acreage. (The lower land was less desirable. It contained ravines and overflowed three or four times each year. This provision was included to protect vendor from the possibility that vendee might choose only prime land, thus leaving vendor with the undesirable land in case of vendee's default).

Possession was to be delivered to Optionee upon exercise of the option. Taxes for 1973 were to be pro-rated and after 1973 to be paid by Optionee. Optionee was given the right to assign the contract.

Paragraph 6, the focus of the controversy, provided:

"In the event Optionee exercises this option and thereafter fails to make any payment when due or fails to comply with the conditions, covenants and agreements set forth herein, the Optionor shall be released from all obligations in law or equity to convey additional property."

Paragraph 9 provided:

"It is understood and agreed by and between the parties hereto that this contract is the entire agreement between the parties, and that no alterations, changes or additions thereto shall be made, except in writing approved by the parties * * *."

The contract does not contain an express forfeiture clause; does not contain a liquidated damages clause; and does not contain a provision that time is of the essence.

Ronald Walker assigned the option contract to Joplin CMI, Inc., a corporation in which Walker had a 90% interest, and on May 11, 1973, Joplin CMI, Inc. exercised the option by the payment of $25,000 to Optionor, which was money loaned to Walker by Ted and Sara Bormaster. The Bormasters also advanced the $50,000 payment made on October 1, 1973. In 1973 the Bormasters acquired 50% of the capital stock of Joplin CMI, Inc. and in 1975 acquired the remaining 50% of the stock. Soon after May 11, 1973, Walker took possession of Oscie Acres and began developing the real estate project. Contractors were contacted; a land use study was commissioned; land was cleared; road work was done; a secretary was employed; draftsmen were hired to prepare plans for model homes and an office was built on a site designated by Walker and conveyed to Joplin CMI, Inc. Between July 9, 1973, and June 6, 1974, nineteen separate parcels

ranging in size from .43 acres to 1.71 acres and totalling 12.18 acres, all located in the upper tract, were selected by Walker and conveyed by Spike's to Joplin CMI, Inc. Walker testified that he delayed selecting any more real estate pending completion of the engineering work, in order to get the most effective use of the land, and pending sale of lots to prospective purchasers. F.R. Melugin, President of Spike's, testified that he delayed selection of land in the lower tract at Walker's suggestion that it would be improper or perhaps unbusiness-like to select and deed "just a half acre at a time"—that Walker wanted him to wait and select forty acres at a time. Neither Melugin nor Walker objected to, and both consented to, the delay of the other in selecting real estate to be conveyed.

Walker made no sales to new purchasers from May 11, 1973, to October 10, 1974; all sales during that period were to buyers whose names were provided to Walker by Spike's.

Joplin CMI, Inc. failed to make the $20,000 payment due October 10, 1974. On October 21, 1974, and February 25, 1975, the principals met to discuss their differences.

### Plaintiff-vendee's Evidence

Walker and Melugin scheduled a meeting to take place a few days before October 10, 1974, when the $20,000 payment was to come due, for the purpose of making the payment and designating the properties to be conveyed to vendee. At Melugin's request that meeting was postponed until the Monday following October 10. When they met Melugin informed Walker that the contract was in default. Melugin expressed dissatisfaction with Ted Bormaster, claiming that the latter had made derogatory remarks around town about Melugin.

On October 21, 1974, a meeting was held at Melugin's house at the instigation of the Bormasters to make the $20,000 payment and reconcile their differences; to see if the parties were in agreement as to the acreage already conveyed and the acreage due to be conveyed. The meeting was at-tended by Ronald Walker, Ted and Sara Bormaster, Ted's father Morris Bormaster, and F.R. Melugin. Melugin, Bormaster and Walker conferred over a map and agreed "in harmony and accord" on how many lots vendee had coming and on how these lots were to be selected. Melugin said there was no hurry in selecting the lots. Walker testified that Ted Bormaster presented Melugin with a $20,000 check naming Spike's as payee. The Bormasters could not remember whether a check was "physically written" but they "came prepared to pay" and had checks with them. Melugin refused to accept payment, stating that the payment was late and holding to his position that the contract "had been defaulted." He said he had been deceived and taken advantage of; that the Bormasters were not the kind of people he thought he was dealing with and notwithstanding he had legal counsel before signing, he had not clearly understood the agreement, which was unfair to begin with. Melugin stated he would not accept any more payments "unless with conditions"—unless Ted agreed to guarantee to go forward, develop the entire tract and complete payments throughout the life of the contract. Ted answered that he could not do that. The conditions were unacceptable; he "did not know what tomorrow brings." Ted refused to make a guarantee or post a performance bond. Ted acknowledged that he may have then said, "There will be no money forthcoming." Sara in explanation testified that there was no reason to make further payment or to go forward with the contract "when we hadn't been given the land for which we had already paid and to which we were entitled under the terms of the contract." The meeting concluded with a statement by Melugin that he was going to see his attorney before conveying any more land.

Thereafter a plat of Oscie Acres, sup-plied by Melugin's surveyors, disappeared from the office of Joplin CMI, Inc. and Melugin's surveyors refused to provide the Bormasters with a copy of the plat, as a result of which the Bormasters were un-

able to select additional lots for conveyance.

On November 13, 1974, Sara Bormaster asked Melugin by telephone when they could select the rest of the land coming to them. Melugin answered that he had talked to his attorney, was advised that he did not have to give Ted any more land, and what he had conveyed was all Ted was going to get.

On February 25, 1975, the parties assembled in the office of Bormaster's attorney for the purpose of seeing whether Melugin would deliver the land due the Bormasters and whether Melugin intended to "nullify" the contract. Ron Walker was absent, in the meantime having become inactive in the project. The attorney asked Melugin, "Are you going to take the $20,000?" Saying "They have defaulted," Melugin read aloud paragraph 6 of the contract and said he was not obligated to convey any more land and was not going to do so, but he would reinstate the contract if Bormaster would give him some assurance that they intended to go through with the entire contract. Melugin offered to accept a 25% discount if all payments were made in advance. Then Melugin said Ted could get what was due him, but not at the contract price of $800 an acre; that it would have to be at market value. Bormaster said, "No way."

### Defendants' Evidence

Melugin's office manager called his attention to the fact that the $20,000 installment had not been paid. Melugin called Walker, who said he would call the Bormasters and see about it. Later Walker told Melugin by telephone, "No, they don't intend to make the payment." At the October 21, 1974 meeting (which Melugin testified Ronald Walker did not attend) Ted said they would like to go forward with the contract if Melugin would forgive the $20,000 payment and "put it at the tail end of the contract." Melugin declined, saying he needed the $20,000 to pay bills he had incurred; that he had spent the $75,000 buying more land, and that he would accept a late payment of the $20,000. Ted "bluntly said 'There will be no money forthcoming at this time'." Morris asked Melugin if he would accept $200,000 for the total amount due. Melugin said, "No", but offered to discount the total amount by 25% or $102,000. The Bormasters did not accept that offer. No complaint was made about Melugin's failure to convey land to them and they did not ask for a refund of their money.

On February 14, 1975, Melugin and Sara Bormaster had a discussion in which they agreed they did not want a lawsuit. Melugin testified he was willing at that time to accept a late payment of the $20,000 and continue the contract.

At the February 25, 1975 meeting Bormaster's attorney asked Melugin if he would convey the land "for the money". Melugin answered that the purchasers had defaulted and read Paragraph 6 of the contract, but he would reinstate the contract for a late payment if they would give him some assurance of intent to go through with the entire contract. The Bormasters refused to give Melugin such assurance. Melugin repeated his offer to discount the total amount by 25%.

On January 1, 1975, the corporate charter of Joplin CMI, Inc. was forfeited for failure to file its annual report.

On July 18, 1975, Sara Bormaster wrote Melugin a letter calling on him to settle the disagreement on a friendly basis, expressing reluctance to resort to a "court battle", calling on Melugin to abide by the terms of the contract and stating that under their interpretation of the contract, backed by the opinions of three separate lawyers, the Bormasters would be awarded all of the land contracted to be conveyed for the $75,000.

After the contract "fell through" Melugin took charge in the spring of 1975, retook possession of and made improvements on the land, constructed roads, built a 60-foot bridge, paid for surveys, geological inspections, bulldozing and excavating, built a lake which he stocked with fish as a commercial enterprise, and resumed adver-

tising and sale of lands subject to the option contract. Spike's purchased an additional 157 acres which was incorporated into the development. Melugin worked personally on the project for eighteen months. He valued his labor at $20,000. Spike's spent a total of $99,857 on improvements, labor, taxes, etc. Taxes throughout the entire period after 1973 (taxes for 1973 were pro-rated with vendee) were paid by Spike's and Oscie-Ora Acres, Inc., its successor. The two corporations made a total of seventy-seven separate conveyances of land to various third-party purchasers. A profit was made on these sales. In 1973 there were approximately fifty houses in the development; at trial time in 1985 there were one-hundred-fifty to one-hundred-fifty-five houses.

In March 1979, all of the 608-acre tract not disposed of, together with other real estate, was transferred by deed to a newly formed corporation named Oscie-Ora Acres, Inc. At that time F.R. Melugin was president of Spike's and of Oscie-Ora Acres, Inc., and he and his wife were the stockholders of both corporations.

In 1982 Melugin and wife transferred all their shares of stock in Spike's to their son Duane Melugin, who assumed the debts of Spike's.

### Subsequent Events

The Bormasters moved from Joplin to Dallas, Texas. Shortly after February 1975, Ted Bormaster became a victim of manic depressive psychosis, became an anti-social recluse, refused to communicate with family and friends, stayed in bed most of the time, and was unable to attend to business. His depression lasted eight years. He refused medicines prescribed by doctors for fear of becoming a drug addict. His depression ended suddenly in September 1983. His recovery was attributed to prayer intervention. During his illness Sara Bormaster managed the family business affairs, which suffered no financial losses. Throughout this period Sara made several efforts to activate their attorney, who took no action. After Ted Bormaster

recovered, he and his wife employed a different attorney, who on September 23, 1985, filed suit in their representative capacities as statutory trustees of Joplin CMI, Inc., naming Spike's and Oscie-Ora Acres, Inc. as defendants. By court order on April 24, 1985, following action by the Secretary of State rescinding the forfeiture of its charter, Joplin CMI, Inc. was substituted for the statutory trustees, as party plaintiff.

In Count I plaintiff sought specific performance of the contract, praying in the alternative for restitution of the purchase price and for the imposition of an equitable lien on the remaining real estate to secure payment of the judgment.

In Count II plaintiff sued for damages for breach of contract, and for an equitable lien.

Tried to the court as a proceeding in equity the trial court found the issues in favor of defendants; found that plaintiff had defaulted under the contract by failing to make the specified payments and by stating that no further payments would be made, thereby excusing vendor under Paragraph 6 of the contract from making further conveyances; ruled that under *First National Bank of West Plains v. King*, 363 S.W.2d 590 (Mo.1963), defendants were entitled to retain the $75,000 as liquidated damages, and that plaintiff's claim was barred by laches.

On this appeal Joplin CMI, Inc. abandoned its request for specific performance, contending for the alternative relief of restitution, and abandoned Count II.

The judgment is reversed for error in declaring and applying the law.

In the *King* case, supra, the Supreme Court quoted with approval the general rule that where there is no express forfeiture provision in a contract a vendor not in default may in the event of a default by vendee amounting to a total breach elect not only to abandon performance on his part but also to retain as forfeited all money paid him on the contract, Annot., 31 A.L.R.2d 1.c. 96; and the general rule that

a vendee who, without breach on the part of vendor, refuses to perform a contract for the purchase of real estate cannot recover from vendor the amount paid on the purchase price, the vendor being ready, able and willing to perform on his part. Annots., 59 A.L.R. 189, 194–195; 134 A.L.R. 1064. See later Annot., Vendee's Recovery—Payments Held by Vendor, 4 A.L.R. 4th 993. The Court, however, went on to say that "(t)hese general rules * * * are subject to numerous exceptions, qualifications and limitations." 363 S.W.2d 1.c. 595.

■ The difficulty with the judgment before us is that the circuit court mistakenly applied the general rules and either ignored or overlooked two vitally important and in this case controlling exceptions, namely, that for the vendor to be entitled to retain money paid by a defaulting vendee he cannot himself be in default, and must be ready, able and willing to perform upon his part. In this case vendor should have been found wanting in both respects.

■ By October 1, 1973, vendee had paid vendor cash totalling $75,000 which under the unambiguous and clear-cut terms of Paragraph 3 required a quid pro quo in the form of warranty deeds to 93.75 acres. By October 10, 1974, when the first $20,000 installment came due, vendor had only partly performed its obligation, having conveyed 12.18 acres, owed vendee 81.57 acres, and in this sense was in default.

We find from a preponderance of the evidence that on October 21, 1974, and on February 25, 1975, vendor defaulted by refusing to accept a proffered late payment of the $20,000 installment, which the Bormasters were prepared to make, and that on February 25, 1975, vendor further and finally defaulted by refusing to convey any more land, at a time when vendor owed vendee 81.57 acres which the latter had bought and for which vendee had paid cash. That the parties modified the selection process by mutual agreement to delay selection did not alter vendor's obligation eventually to account to vendee for the 81.57 acres; although vendee's failure to designate the particular lots for conveyance extended the time for performance by vendor it did not extinguish vendee's rights or excuse vendor's duty to perform.

Vendor claims that the parties "went outside the framework of the contract" in the conveyance of the 12.18 acres. This notion is a gratuitous suggestion without basis in the evidence, was never agreed to, without consideration, and in violation of Paragraph 9 which prohibits any alteration of, changes in, or additions to the contract as written. There is no evidence that vendee paid vendor any consideration for the 12.18 acres separate and apart from the cash paid under the contract. Melugin testified that the market value of the 12.18 acres was approximately $1,500 an acre, which would have amounted to $18,270. It would be unreasonable to conclude that these conveyances were made gratis and without reference to the contract. Clearly, the 12.-18 acres were conveyed under the provisions of Paragraph 3, which required vendor to convey portions of the 608 acres *"at various times on the occasion of each cash payment."*

Vendor contends that the $75,000 constituted merely a down payment or earnest money, and was not an installment requiring conveyance of land. The $25,000 and $50,000 payments are not designated in the contract as earnest money or down payments. On the contrary, they are clearly and unequivocally the "payments of cash" referred to in Paragraph 3, entitling vendee to conveyance of land at $800 per acre.

Based upon a misconstruction of Paragraph 6, vendor disclaims an obligation to convey *any* land until payment of the first $20,000 installment due October 10, 1974, at which time, if the installment were paid, vendor says it would have been required to convey $20,000 worth of land at $800 an acre, *minus the 12.18 acres conveyed prior to October 10, 1974.* This interpretation of Paragraph 6 would result in a frustration of the contract, under which vendee was eventually to receive 608 acres over a period of years, in return for total payments of $486,400, figured at $800 an acre.

Under vendor's construction of Paragraph 6 the first $75,000 paid to vendor would not count—would not "earn" any acreage—but would be deducted from the $486,400, leaving only $411,400. Divided by 800 the latter figure would entitle vendee to only 514.25 acres instead of the 608 acres for which it contracted.

Vendor mistakenly interprets Paragraph 6, contending that the words releasing vendor from the obligation to convey "additional property" upon failure of vendee to make a payment when due does not mean "additional lands not paid for" but means "any new land which would be added to the aggregate of the land already conveyed"; that the only reasonable interpretation of Paragraph 6 is that it excused vendor from making any further conveyances of land after vendee's default; that Paragraph 6 provided for a forfeiture in the event of a breach by vendee, entitling vendor to retain the $75,000 as "liquidated damages."

■ In the context of the entire agreement, viewed as a whole, including fundamentally important Paragraph 3, the words "obligation in law and equity to convey additional property" occurring in Paragraph 6 refer to property in addition to that which previously had been bought, paid for and conveyed, or which (as is this case) previously had been bought and paid for, but for justifiable reasons had not been conveyed. The wording of Paragraph 3 obligating vendor to execute and deliver warranty deeds "on receiving payments of cash" contemplates and assumes prompt and timely conveyances—transactions completed forthwith—and the wording of Paragraph 6 releasing vendor for vendee's failure to make any payment when due necessarily relates to vendee's defaults occurring *after* consummation of such completed transactions. The words of Paragraph 6 are prospective, not retrospective, in intendment. They refer to release of vendor from future performance after subsequent default by vendee. They protect vendor from liability to convey additional land if a defaulting vendee thereafter proffers additional cash, selects additional portions of land, and demands additional conveyances. In all fairness and equity these words may not be construed to excuse a vendor from full performance where he has only partially performed, or to release a vendor from an obligation already incurred—in this case, a duty to either convey or account for land previously paid for prior to default.

The trial court's ruling, the effect of which is to declare a forfeiture of $65,256,[1] is erroneous, not only because Paragraph 6 provides no basis for vendor retaining the unused portion of the $75,000 as liquidated damages, but also because (1) there is no evidence that vendor suffered any loss or damage in excess of profits made on the venture; (2) vendor disclaimed damages by announcing in open court during the trial, when vendee undertook to introduce evidence of no damages, "We're not praying for any damages, Your Honor," and (3) the ruling is inequitable and unconscionable because it sustains a forfeiture amounting to 87 percent.

■ Spike's acts resulted in a rescission of the contract. When Melugin decided that the $75,000 was forfeited (although there was no express forfeiture clause, liquidated damages clause, or "time is of the essence" clause) he declared vendee in default, refused to accept payment, refused to "reinstate" the contract except upon new conditions unacceptable to vendee, refused to convey land already paid for, reentered possession of the 608 acres, resumed active development and sale of the acreage to third parties; through Spike's and Oscie-Ora Acres, Inc. conveyed portions thereof to 77 grantees (to that extent disabling Spike's from performing the contract), and thereby he breached, abrogated and repudiated the contract ab initio and effected a rescission. "The refusal of the vendor to perform an executory contract for the sale of land, his repudiation of the contract, his unjustifiable attempt to rescind it, or his disabling himself to perform it, will entitle the vendee to recover the

1. $75,000 less 12.18 acres times $800 an acre, or $9,744.

amount he has paid on the purchase price." Annot., Vendee's Recovery of Purchase Money, 59 A.L.R. 1.c. 257–258. When a contract for the sale of land is rescinded by the vendor he may not keep both the money and the property. Equity will require vendor to restore the parties to the status quo. *First National Bank of West Plains v. King, supra,* 363 S.W.2d 1.c. 596, citing *Austin & Bass Builders, Inc. v. Lewis,* 350 S.W.2d 133 (Mo.App.1961); *Bennett v. Adams,* 238 S.W.2d 442 (Mo.App.1951); *Haynes v. Dunstan,* 104 S.W.2d 1025 (Mo.App.1937); *Norris v. Letchworth,* 140 Mo.App. 19, 124 S.W. 559 (1910). Restoring the status quo revives the situation existing immediately prior to October 10, 1974. At that time Spike's owed Joplin CMI, Inc. 81.57 acres of land at the contract price of $800 an acre (worth $65,256); Spike's had the right to select and the duty to convey 12.18 acres from the lower land, and Joplin CMI, Inc. was obligated to accept a deed therefor. Spike's voluntarily relinquished this known right when its president refused to convey further, and therefore waived the right. Under the circumstances equity requires defendants to restore to Joplin CMI, Inc., the uncompensated portion of the $75,000 received under the contract. 92 C.J.S. Vendor and Purchaser § 550. Joplin CMI, Inc. is entitled to restitution in the amount of $65,256.

 Is plaintiff entitled to an award of interest as prayed for in Count I? Section 408.020, V.A.M.S., provides for nine percent interest after moneys become due and payable on written contracts. In equity an allowance of interest is generally a matter for the chancellor's discretion. *Boyle v. Crimm,* 363 Mo. 731, 253 S.W.2d 149, 157 (1952). In order to attain the ends of justice in this case plaintiff is entitled to some compensation for the use of the money during the period of defendant's repossession of the land, *Cannon v. Bingham,* 383 S.W.2d 169 (Mo.App.1964), but in view of plaintiff's delay in asserting its rights we deem it inequitable to award interest from February 1975, and rule that interest not begin until there was a formal demand for payment of interest which was not made

prior to the filing of this action on September 23, 1983. *Independence Flying Service, Inc. v. Ailshire,* 409 S.W.2d 628, 632 (Mo.1966).

 Next, should Joplin CMI, Inc. be denied recovery on the ground of laches? The general principles applicable to the defense of laches were well stated in *Lake Development Enterprises, Inc. v. Kojetinsky,* 410 S.W.2d 361, 367–368 (Mo.App. 1966), quoted with approval by the Supreme Court in *Metropolitan St. Louis Sewer District v. Zykan,* 495 S.W.2d 643, 656–657 (Mo.1973), and need reiteration here:

> "Laches" is the neglect for an unreasonable and unexplained length of time under circumstances permitting diligence, to do what in law, should have been done. There is no fixed period within which a person must assert his claim or be barred by laches. The length of time depends upon the circumstances of the particular case. Mere delay in asserting a right does not of itself constitute laches; the delay involved must work to the disadvantage and prejudice of the defendant. Laches is a question of fact to be determined from all the evidence and circumstances adduced at trial. Equity does not encourage laches. * * * Laches cannot be invoked to defeat justice. It will be applied only where enforcement of the right asserted would work an injustice. * * * The burden of proof as to laches rests on the party asserting it * *. " * * * Where no one has been misled to his harm in any legal sense by the delay, and the situation has not materially changed, the delay is not fatal. * * * "

The Bormasters gave the following reasons for the delay: The necessity of moving from Missouri to Texas to look after their business interests; the neglect and failure of their attorney to take requested action, and Ted Bormaster's medical condition, which incapacitated him for more than eight years. These reasons help explain, but do not excuse or justify the delay. Sara Bormaster, a capable person with a

practical grasp of the situation and an officer of Joplin CMI, Inc., could have filed suit much sooner but neglected to do so. To sustain the plea of laches, however, there must be something more than simply sleeping on one's rights, as indicated in *Kojetinsky*, supra. There must be a showing that the complaining party was prejudiced or damaged by the delay. To meet this requirement, and in support of their claim that they have been damaged in excess of $100,000, defendants point to these facts: that Spike's acquired additional land, developed the project, paid the taxes on the land, made costly improvements, caused the development to grow by approximately one hundred homes, and that Melugin himself contributed labor worth $20,000. Instead of these facts working to the disadvantage of defendants and demonstrating a loss to them, it appears that these facts enured to their advantage. By Melugin's own testimony profits were made on the substantial number of sales made between February 1975 and June 1984, most of which sales were made from the 608–acre tract. According to defendants' Exhibit O, these sales brought prices totalling more than $350,000. In addition, defendants have had the use of the $75,000 since October 1, 1973, and enjoyed the benefit of the increase in value of the remaining acreage due to the considerable inflation of land values during this period, of which we take judicial notice.

Defendants further argue that Morris Bormaster's testimony was lost to them due to incapacity resulting from advancing age during this long period; that some of plaintiff's records were lost by the negligence of their attorney, and a fire; that the tract was conveyed to a new corporation (Oscie-Ora Acres, Inc.); that part of the $75,000 was used to purchase additional land and therefore is unavailable for the payment of a judgment. Defendants, however, have not demonstrated how or in what manner these last detailed facts have resulted in prejudice, injustice or disadvantage to them. The court erred in barring this action on the ground of laches.

■ Defendants further submit that Oscie-Ora Acres, Inc. is not a proper party to this action; that Oscie-Ora Acres was impleaded on an allegation of *constructive* trust, but that plaintiff failed to prove fraud, which is an essential ingredient of a constructive trust; that Oscie-Ora Acres, Inc. is a bona fide purchaser of the 608–acre tract for value, and therefore took the land free of any claims by plaintiff. We conclude that Oscie-Ora Acres, Inc. is a proper party, as the successor of Spike's and present holder of title to the 608 acres, purchased at a time when F.R. Melugin was president of both Spike's and Oscie-Ora Acres, Inc. As an officer of Oscie-Ora Acres, Inc., Melugin's knowledge of the claims and rights of Joplin CMI, Inc. was and is the knowledge of the corporation. That the petition sought to subject the land to a constructive trust, rather than a resulting trust, (a mistake in descriptive nomenclature confessed by plaintiff) will not keep equity from doing equity, where plaintiff is otherwise entitled to equitable treatment.

■ Finally, it is urged that the action is barred by the five-year statute of limitations, § 516.120, V.A.M.S.; that under *Lively v. Tabor*, 341 Mo. 352, 107 S.W.2d 62 (1937), and other cases cited by defendants, the five-year statute applies because extrinsic evidence was necessary to prove plaintiff's case, on the basis that the ten-year limitation applies where the rights of the parties are reduced to writing and a judicial determination of those rights can be made by an examination of the document itself, but that where extrinsic evidence is required to make the case, the shorter limitation period prevails to prevent presentation of evidence made stale by the passage of time. *Lively* and the other cases cited are to be distinguished on the facts. Here, the obligation of Spike's which provides the basis of this action is found in the express wording of the contract. This action is based upon a "writing * * * for the payment of money or property" within the meaning of the ten-year statute of limitations, § 516.110, V.A.M.S.

This action was brought within ten years after November 13, 1974, the date the president of Spike's first definitely refused to make any further conveyance of land, *Jones v. McGinley Land Co.*, 228 Mo.App. 944, 74 S.W.2d 853 (1934); *Curtis v. Sexton,* 201 Mo. 217, 100 S.W. 17 (1907), and is not barred by limitations.

The judgment and decree is reversed and the cause remanded for entry of a new judgment for Joplin CMI, Inc. and against both defendants in the sum of $65,256, plus interest thereon at 9% from September 23, 1983, to date of the new judgment, and for costs; and to secure payment of the money judgment the circuit court is directed to impose a first and superior equitable lien or charge in favor of plaintiff upon all of the 608–acre tract not sold and conveyed to third parties.

PREWITT, C.J., HOGAN, P.J., MAUS and CROW, JJ., and ROBERT LEE CAMPBELL and ANNA C. FORDER, Special Judges, concur.